IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) ) | |
| Petitioner, | ) ) ) | |
| vs. | ) ) | Case No. 3:07-cv-211 |
| JOHN M. HARRISON, CELIA H. HARRISON, and SWEETWATER VALLEY FARM, INC., | ) ) ) ) ) | Magistrate: Guyton |
| Respondents. | ) | |

## PETITIONER'S TRIAL BRIEF

Comes the Petitioner Norfolk Southern Railway Company (NSRC), by and through counsel, and submits the following trial brief.

## FACTS

In 1836, the Tennessee Legislature gave to the Hiawasee Railroad Company a right of way across certain lands in Tennessee via a Charter enacted that year. This 1836 Charter (hereinafter "the Charter") granted the Hiawasee Railway Company a right of way over property in Monroe and Loudon County, including the Harrisons' property. The right of way remains intact. NSRC is the successor in interest to the Hiawasee Railroad Company. Furthermore, the parties have stipulated to NSRC's easement interest across the Harrisons' land. ( Doc. 13).

The 1836 Charter grants certain rights to the original landowner of the property through which the tract was laid. Specifically, the Charter provides as follows:

> That when it shall be necessary to pass through the improved land
> of any individual, it shall be the duty of said [railroad] company to

1

> provide such individual with a proper and suitable wagon way
> across said road from one part of his or her land to the other, and
> the same shall be required by said owner, at the time of route of
> said railroad [is] determined on, but the owner of such land may
> at any time after said railroad shall be opened and completed,
> construct and make such wagon way across the same at his or
> her own expense, under the supervision and/or direction of said
> company.

Admittedly, it seems that Hiawassee had a duty to provide the original property owner with "proper and suitable wagon way" across its tracks. It is unknown whether the current crossing on the Harrisons' property stems from this "proper and suitable wagon way" covenant. It is unknown when the crossing in question was first created and how long it has been in use. It is also undisputed that the Harrisons have been using the crossing since purchasing the property.

The Harrison first purchased this property in 1987, and at that time the farm was used for traditional dairy purposes. In 1998, the Harrisons began the production of cheese, and shortly after this new production line opened, the Harrisons constructed a retail store with advertising inviting the general public to their farm. With the introduction of this retail store, traffic increased greatly across this private crossing. John Harrison has admitted in his deposition that traffic doubled at the crossing since the retail and tour division began, estimating that approximately 300 vehicles cross the tracks now each day. This traffic includes tour buses and school tours.

In the last ten years or so alone, there have been advisements issued through that stretch of track, a crossing accident in the 1990's involving an employee of the farm, an accident on May 27, 2006 involving injuries to tourists invited onto Sweetwater Valley Farm by the Harrisons, and most recently a near-miss in 2007 in which the train was

required to throw its brakes and be delayed. The nature of the change in traffic is what most concerns NSRC. Rather than personal vehicles, commercial dairy trucks, tractors, etc., now tourists, families, children, and even tour buses use this private crossing to access the retail portion of the Harrisons' operation. As to the impact on the railroad, NSRC has now been exposed to a disproportionately greater risk of a grade-crossing collision involving the tourists, families, children and other members of the general public invited onto the private driveway by the Harrisons, all of whom are much less familiar with the frequency and speed of NSRC's operations over the crossings than the Harrisons themselves

The Harrisons have plans of increasing their retail and tourism business by three to four times its current level. They are also planning on directly soliciting church and school groups for a greater number of tours. The traffic will only increase at the crossing, and the risks inherent in members of the general public using a private grade crossing with which they are generally unfamiliar will grow. NSRC simply cannot be forced to shoulder the increased burden of this dramatic change in use; this massive increase and substantial change in business has unilaterally increased the Harrisons' wealth and in turn burdened NSRC's operations. The Harrisons, then, should be forced to either abandon the crossing or at the very least curtail its use to prevent members of the general public from using it. If the Harrisons want to continue the retail operation on the property and give tours of the dairy farm, they should supply access to the farm directly from Highway 323, which would avoid burdening NSRC's right of way beyond the terms of the Charter.

The parties have admittedly attempted to resolve this dispute for several years, but no resolution has been reached. NSRC has filed the federal action based upon the

3

concern for public safety as the increase in traffic at the crossing continues and for relief from economic damages sustained by the necessity of accident expenses. NSRC, then, would ask that this Court allow NSRC to close the crossing or order the Harrisons to curtail its quasi-public use and forbid them from inviting members of the general public to use it. This request comes because the Harrisons' use of their "wagon way" clearly exceeds the use that was originally contemplated by the Charter. In the alternative, NSRC would ask that the Court order the Harrisons to pay for the cost of upgrading safety equipment at the crossing to accommodate the quasi-public use with which the Harrisons have burdened NSRC's property.

## LAW

Generally, under Tennessee law, a railroad company has a propriety right to close private grade crossings. <u>Scott County, Tennessee v. Cincinnati, New Orleans and Texas Pacific Railway Co.</u>, 915 F. Supp. 928, 932 (E.D.Tenn. 1995). Concerns for public safety and interference with the operation of trains at speeds authorized by the Federal Railroad Administration are valid causes for the closing of such private crossings. <u>Id.</u> Where a right of way for a railroad is granted by a Charter, the railroad enjoys an absolute right to conduct railroad purposes, and the owner of the fee can subject the land to any use **that does not interfere with the railroad's use of such right of way**. <u>Southern Railway Company v. Vann, et ex</u>, 142 Tenn. 76 (1919). Furthermore, a landowner can only occupy a railroad's right of way for "his private purposes" and not for purposes "inconsistent with the public uses" to which the railroad puts their right of way. <u>East Tennessee v. Telford</u>, 14 S.W. 776, 777 (Tenn. 1890); <u>see also</u> <u>Town of Collierville v. Norfolk Southern Railway Co.</u>, 1 S.W.3d 68 (Tenn.Ct.App. 1998).

The cases above illustrate the rights of a railroad specifically. Tennessee courts have also held that interference with the proper use of any easement is actionable. See M.L.G.W. v. Starkey, 244 S.W.3d 344, 349 (Tenn.Ct.App. 2007). In Starkey, a developer interfered with a utility company's underground easement for a gas pipeline, despite repeated warnings from the utility company concerning the potential for danger to the public. Id. The developer continued to excavate in the company's right of way even after receiving demands to terminate development, and the utility was awarded both compensatory and punitive damages for the developer's interference with their easement. Id. at 352; see also Rector v. Halliburton, 2003 WL 535924 (Tenn.Ct.App. 2003), Cooper v. Polos, 898 S.W.2d 237, (Tenn.App.1995) (holding that a servient estate cannot interfere with the dominant estate's use of a valid easement).

The Commerce Clause of the Constitution is also triggered by the Harrisons' use of this crossing. Through the Commerce Clause, Congress is given the power to "regulate Commerce with foreign Nations, and among the several States...." U.S. Const. art. I § 8, cl. 3. By this Clause, state laws can be unconstitutional if they impermissibly restrict interstate commerce. The constitutionality of a state law affecting interstate commerce turns on "two lines of analysis: first, whether the ordinance discriminates against interstate commerce, and second, whether the ordinance imposes a burden on interstate commerce that is clearly excessive in relation to the putative local benefits." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994). To that extent, any state law that interferes with this Constitutional right and imposes a burden on NSRC's right to conduct interstate commerce is unconstitutional.

5
Case 3:07-cv-00211 Document 34 Filed 10/24/08 Page 5 of 8 PageID #: 95

# ARGUMENT

The Harrisons have been very successful over the last ten years in the growth of their business. Their customer base has both changed and expanded. NSRC, on the other hand, has been negatively affected by the Harrisons' growth. NSRC has incurred substantial costs because of the Harrisons' continued interference with its easement across their land. In fairness, NSRC should not have to continue to suffer the increased burden of the expansion of the Harrisons' business and the subsequent interference with NSRC's operations.

At trial, NSRC expects that the proof will show that (1) there has been a substantial change in the nature of the easement because of the Harrison's exponential increase in traffic, and (2) NSRC has been financially burdened by these changes. NSRC expects to put on proof as to the nature of the burden imposed at the crossing and the costs associated with accidents that have occurred in the past. NSRC also hopes to demonstrate that as the usage of the crossing increases, the burden on NSRC will grow as well, and the interference with its right to do business across the easement will become untenable. As case law suggests, NSRC, as a railroad carrier, has a right to close a crossing in the interests of public safety and a right to use its easement without undue interference.

Futhermore, the Harrisons' increased use and subsequent burden on the railroad interferes with NSRC's rights under the Commerce Clause. The Harrisons' claim that an ancient Tennessee statute (39th General Assembly, 1875, Chapter 142, Section 6) requires NSRC to provide a grade crossing for their farm, presumably ad infinitum and irrespective of the uses to which the crossing is put. Such a mandate burdens NSRC

because it cannot then effectively regulate the safety of the crossing. Such an imposition would further cause direct financial losses due to both the necessity of delays from slow-orders issued during heavy-use days and accidents that have occurred and may occur in the future. Such burdens interfere with NSRC's right to conduct business and are therefore unconstitutional. All of the Harrisons' claims, then, as to Tennessee statutory or common law rights to use this crossing are trumped by NSRC's right to do interstate business without interference.

## CONCLUSION

Because the railroad will demonstrate the requisite burden on its operations by the Harrisons' interference with the easement, and because the Harrisons' cannot rely on Tennessee law to mandate the continuation of the grade crossing, NSRC asks that at the conclusion of proof the Court grant it the ability to close or restrict the crossing, or in equity require the Harrisons' to pay for the costs of upgrading safety equipment.

Respectfully submitted,

**BAKER, O'KANE, ATKINS & THOMPSON**
s/Brent A. Morris, BPR#024621
Attorney for Petitioner
2607 Kingston Pike, Suite 200
P.O. Box 1708
Knoxville, TN 37901-1708
(865) 637-5600

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access the filing through the Court's electronic filing system.

s/Brent A. Morris