UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 3:07-CV-211 (GUYTON) |
| JOHN M. HARRISON, CELIA H. HARRISON, and SWEETWATER VALLEY FARM, INC., | ) ) ) ) | |
| Respondents. | ) | |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case is an action brought by Norfolk Southern Railway Company ("Norfolk Southern"), the owner of a railroad right of way across land owned by the Respondents, prompted by the Respondents' growing use of the land as a dairy farm and retail sales business. Norfolk Southern is asking the Court to order the Respondents to install improved safety devices and signals on that part of their land where their driveway crosses the railroad tracks, or reimburse Norfolk Southern for the cost of upgrading safety equipment at that crossing. Norfolk Southern, in the alternative, argues that the Court could close the crossing or restrict the use of the crossing by the Respondents. [Doc. 32].

The subject matter jurisdiction of the Court is not in dispute [Doc. 32]. The parties have consented to magistrate jurisdiction for all proceedings in this case, including entry of judgment in accordance with 28 U.S.C. § 636(c) [Doc. 8].

## PROCEDURAL HISTORY

The Complaint [Doc. 1], requesting trial by jury, was filed in May, 2007, and the Respondents filed their Answer [Doc. 5] in July, 2007. The Respondents also brought a Counterclaim. The Petitioner filed its Answer [Doc. 9] to the Counterclaim in August, 2007. In January, 2008, the parties filed a Stipulation [Doc. 13], which established the following facts:

> 1. Norfolk Southern does not have a fee interest in any of the [Respondents'] land; and
>
> 2. Norfolk Southern has an easement interest which corresponds with the lay of the railroad tracks over the [Respondents'] land.

In April, 2008, the Court, at the request of the parties, entered an Order [Doc. 20] staying the case while the parties attempted to resolve the dispute through mediation. Upon receiving the report [Doc. 21] that the mediation was unsuccessful, the Court conducted a status conference and lifted the stay [Doc. 24]. At the conference, the Respondents made an oral motion to bifurcate the issues of liability and damages for separate trials, with the liability phase to be tried non-jury. The Petitioner did not oppose the motion, and the Court granted it [Doc. 23]. As a result, this matter was tried on October 27, 2008, without a jury, on the issue of liability only [Doc. 23]. The Court received five exhibits into evidence and heard testimony from three witnesses: John W. Harrison, William Barringer, and Steve Driskell. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

John and Celia Harrison have owned at least part of the land relevant to this case since 1987. In 1992 they became the sole owners of the land, and they formed a corporation,

Sweetwater Valley Farm, Inc., to operate the dairy farm business located thereon. The Harrisons and their children also live on the property.

In 1998 the Respondents built a cheese production facility and a retail store to sell cheese and other items on the property, more or less adjacent to their residence. Today there are approximately 2,000 cows on the farm.

To access the dairy farm operation, the cheese production facility, the retail store, and their residence, the Harrisons use a paved driveway which connects with State Highway 11. The driveway and Norfolk Southern's railroad tracks intersect, such that someone traveling to the dairy farm operation, the cheese production facility, retail store, or the Harrison's residence must cross the railroad tracks.

In the Spring of 1999, the Respondents began advertising for the retail store, and at some point began offering farm tours to the general public. The retail store currently is open six days a week. The Respondents have had cheese festivals on the property, attended by approximately 1,500 to 2,000 people. Over the past five years, the Respondents' business has grown every year. Currently, the dairy operation produces between 6,000 and 7,000 gallons of milk a day, approximately ten to fifteen percent of which is used in-house for cheese production. As a result of all of this, approximately 300 cars a day travel from Highway 11 to the Respondents' businesses on the property. This translates to approximately 600 "crossings" a day of Norfolk Southern's railroad tracks. By contrast, prior to 1998, there were approximately 300 crossings a day, primarily related to dairy farm usage.

The Respondents plan to continue the growth of their businesses through expanding the retail and tourist components by three or four times. They hope, by the summer of 2009, to triple

3

the number of visitors to the property. One aspect of this plan would be to target school and church groups.

Recently, the Respondents hosted a 4-H Club Fun Day on the property. Six hundred fourth grade children attended.

In 2006 there was an accident at the crossing of the Respondents' driveway and the Petitioner's railroad tracks. A person visiting one of the Respondents' employees apparently stopped his vehicle on the crossing, and the vehicle was struck by the Petitioner's train. The vehicle operator was not injured.

In the mid 1990s one of the Respondent's employees was struck by a train after he pulled too close to the tracks.

The Respondents have paid nothing to the Petitioner for the cost and maintenance of the crossing, or for expansion of the crossing to accommodate Respondents' traffic. Nor have the Respondents agreed with the Petitioner to maintain the crossing or to restrict the use of the crossing.

Currently there are several warning signs at the intersection of the railroad tracks and the Respondents' driveway, including a sign reading "STOP" installed by the Respondents. Later, and adjacent to this sign, the Petitioner installed a taller signpost bearing three signs: A traditional red "STOP" sign, a sign reading "PRIVATE RR CROSSING - LOOK" and a larger x-shaped sign reading "RAILROAD CROSSING." In addition, the Respondents painted a white set of cross-bucks with "RR", and two white lines on the driveway on either side of the tracks.[1] The Petitioner maintains the asphalt in the immediate area of the track right of way.

---

[1] Trial Exhibits 3, 4, and 5 are photographs of the signage and roadway markings.

The Respondents have taken certain action with regard to the safety of the railroad right of way. They have discussed the issue with new employees, controlled vegetation to maintain good visibility, and placed railroad safety brochures in the retail facility. The Harrisons have instructed their children about railroad safety.

The Respondents also own the property on the opposite side of Highway 11 from the entrance to their dairy farm and retail operation. If the Respondents chose to relocate their retail store to the other side of the highway, retail patrons would not be required to cross the railroad tracks.

Norfolk Southern monitors private grade crossings, of which there are about 10,000 in the Norfolk Southern system. At the Respondents' private grade crossing in issue, there have been three crossing accidents, one in 2006, one in 1993, and one in 1983. The 2006 and 1993 incidents, discussed herein above, did not involve personal injury. In the 1983 incident, a train collided with an automobile and two persons were killed.

If an accident were to occur today at the Respondents' private crossing, the Petitioner estimates that the train would be stopped between two and a half to three hours.[2] Petitioner further estimates the cost to it would be approximately $16,000 for a three hour delay, based on the Respondents' crossing seeing an average of 15 to 20 trains per day. Petitioner estimates that the cost would be the same if there is no collision or accident, but for some reason the engineer must apply emergency braking. In that situation, the train must come to a complete stop, and the engineer must walk the entire train checking for derailment. The cost to Norfolk Southern of a derailment can be slight to millions of dollars, depending on the scope of the derailment. In addition, when a train is

---

[2]There is more delay if there is a fatality, up to five to seven hours.

stopped for two to three hours, other trains down the line are likewise affected.

According to Norfolk Southern, the Respondents' crossing: (1) is safe for a motorist who complies with the warnings and directions of the signs posted, and (2) does not pose a public safety issue. Nonetheless, Norfolk Southern has a safety concern regarding the Respondents' visitors who are unfamiliar with the crossing, because some motorists do not comply with signage.

The Respondents' crossing is a "private", not "public", crossing, according to the definitions of same contained in the May, 2008 publication, Private Highway-Rail Grade Crossing Safety Research and Inquiry, published by the Federal Railway Administration. To qualify as a public crossing, there must be a public road on at least one side of the crossing. And in most, if not all cases, the daily volume of motor vehicle traffic over a crossing is irrelevant to whether it is defined as a public or private crossing.

The number of trains which operate each day on the stretch of track by the Respondents' property averages between 15 and 20 to 25. The track is a Class Four classification track, which allows for a maximum speed of 60 miles per hour. The average train speed through this area is 30-45 miles per hour.

When there was a cheese festival at the Respondent's property, the Petitioner issued an advisement to crews of trains to be more vigilant in that area.

Regular maintenance, repair and/or replacement of the cross-ties, tracks and ballast area of the subject crossing occurs on a three-year basis. Norfolk Southern has performed and paid for all such work.

Petitioner has plans to increase train traffic in the subject area, starting in 2009, to 18 to 20 to 25 trains per day. There is also a possibility that coal train usage may increase.

6

There has been one "near-miss" accident at the subject crossing where the engineer actually had to throw the brakes and bring the train to a stop. That happened in 2006 or 2007. That "near-miss", plus the three accidents referenced hereinabove, are the only instances of delay, according to the Petitioner.

In a "couple of instances", the train has stopped at the Respondents' property so that the train's crew could purchase cheese from the Respondents' retail store.

## **CONCLUSIONS OF LAW**

Based on the Agreed Pre-Trial Order, it is undisputed that in 1836, the Tennessee Legislature gave to the Hiawassee Railroad Company a right of way across certain lands in Tennessee via a Charter enacted that year. This 1836 Charter ("the Charter") granted the Hiawassee Railway Company a right of way over property in Monroe and Loudon County, including the Respondents' property. Norfolk Southern is the successor in interest to the Hiawassee Railroad Company. The right of way remains intact, and the parties have stipulated to Norfolk Southern's easement interest across the Respondents' land.

The Charter grants certain rights to the owner of the property over which the right of way runs. Specifically, the Charter provides as follows:

> That when it shall be necessary to pass through the improved land of any individual, it shall be the duty of said [railroad] company to provide such individual with a proper and suitable wagon way across said road from one part of his or her land to the other, and the same shall be required by said owner, at the time of route of said railroad [is] determined on, but the owner of such land may at any time after said railroad shall be opened and completed, construct and make such wagon way across the same at his or her own expense, under the supervision and/or direction of said company.

7

Therefore, Hiawassee had a duty to provide the original property owner with "proper and suitable wagon way" across its tracks. Norfolk Southern continues to provide this crossing, and it continues, at its expense, to maintain, repair or replace the improvements which it has placed on the right of way in order to conduct its railroad business.

The issue in this case is not the use being made of the right of way by the railroad, but the use being made of the crossing by the Respondents and the Respondents' invitees, or customers. Norfolk Southern claims that the success and growth of the Respondents' dairy farm and cheese making operations, along with the retail store, farm tours, group events, cheese festivals, and the like, have increased motor traffic across the railroad crossing. According to the Petitioner: "The traffic will only increase at the crossing, and the need for improved safety devices may become apparent. [The Petitioner] can not be forced to shoulder the burden of ensuring the safety of the invitees who use the Harrisons' crossing. . . [The Respondents] should be responsible for the increased protections that may be needed to ensure their customers' safety" [Doc. 32].

The Harrisons claim that they are rightfully exercising their rights as the owner of the property that underlies the Petitioner's right of way. They assert that the use of their driveway does not unreasonably interfere with Norfolk Southern's operation of its trains. They argue that they should not be forced to provide any improvement to the right of way.

In Tennessee, where a right of way for a railroad is granted by a Charter, the railroad enjoys an absolute right to conduct railroad purposes. The owner of the fee can subject the land to any use which does not interfere with the railroad's use of such right of way. Southern Railway Company v. Vann, et ex, 142 Tenn. 76 (1919). Therefore, the Harrisons have a right to use the easement area for any use, including crossing it, so long as it does not interfere with Norfolk

8

Southern's use.

Norfolk Southern in support of its position, cites <u>Scott County v. Cincinnati</u>, <u>N.O. & Tex.Pac. Ry.</u>, 915 F.Supp 928 (E.D. Tenn. 1995). The <u>Scott County</u> case involved the issue of whether CNO&TP could close two crossings. The two crossings at issue were described by CNO&TP as "private, not public, crossings" that were "not part of the county road system." <u>Id.</u> at 930. Apparently public roads led up to each side of the crossings, but CNO&TP had never entered into any agreement with Scott County that authorized the crossings. <u>Id.</u> at 932. These crossings had been created by public usage, but not by any formal agreement between the railroad and Scott County. Therefore, the Court held that CNO&TP had the right to close those private grade crossings in the interest of the safety of higher speed trains. <u>Id.</u> at 932.

The <u>Scott County</u> case, however, is distinguishable from the present case in two important ways. First, the common law of Tennessee regarding the respective rights of a fee owner and an easement holder, as established by the <u>Vann</u> case, supra. Second, the existence of both Section 21 of Chapter III of the Local Acts of the Twenty-First General Assembly of the State of Tennessee 1835-6 and an enactment of the General Assembly in 1875. Those provide a statutory and charter obligation of the Railroad to provide a grade crossing under the circumstances existing in the instant case. In short, there was no obligation on the part of CNO&TP to provide a grade crossing at the locations involved in the <u>Scott County</u> case.

Chapter III, Local Acts 1835-6, is entitled "An Act to incorporate the Hiawassee Rail Road Company." Norfolk Southern is the successor-in-interest to the Hiawassee Rail Road Company and the source of the Petitioner's interest in the tracks in issue was the 1835 Charter granted to the Hiawassee Rail Road Company.

9

Section 21 of Chapter III, Local Acts 1835-6, provides as follows:

> *Be it enacted*, That when it shall be necessary to pass through the improved land of any individual, it shall be the duty of said company to provide such individual with a proper and suitable wagon way across said road from one part of his land to the other, if the same shall be required by said owner, at the time the route of said rail road (is) determined on, but the owner of such land may at any time after said rail road shall be opened and completed, construct and make such wagon way across the same at his or her expense, under the supervision of said company.

The Petitioner's track divides the property of the Harrisons. The crossing is of the nature that is required under the Charter from the State of Tennessee.

Added to the requirement in Section 21 of Chapter III, Local Acts 1835-6 that the Petitioner provide a crossing from one part of the Harrison's farm to the other part, there is another statutory provision of a similar requirement. In 1875, the General Assembly enacted a set of provisions that set forth required charter provisions for all railroads authorized to operate in the State, Acts of the State of Tennessee, 39th General Assembly, 1875, Chapter 142, Section 6. One of the provisions of that passage is the following:

> When land on both sides of the track is owned by the same proprietor, convenient crossing shall be made and kept up at the expense of the corporation for the use of said proprietor, and all necessary cowgaps made.

Id. at 239.

The Respondents correctly note that the 1875 enactment requiring railroads to provide and maintain crossings for bisected landowners remained "on the books" until 1931, when the Code of Tennessee of 1932 was enacted. The Code of Tennessee of 1932 was the first official codification of existing laws in Tennessee since the Code of 1858.

Section 2 of the Code of Tennessee of 1932 begins the explanation of whether former

statutes, not codified within the new Code, would continue in effect when it states:

> **Repeal of what statutes.** – All public and general acts passed prior to the present session of the general assembly, and all such acts the subjects whereof are revised in this Code, except those named below, subject to the limitations and with the exceptions herein expressed, are repealed. And, in case of any conflict between the acts of this session of the general assembly and this Code, the former shall be controlling, and this regardless of respective dates of passage or approval.

Then Section 3 of the Code of Tennessee of 1932 follows with the following provision, which reads in pertinent part:

> **Laws not repealed.** – The following are not deemed repealed by the enactment of this Code, or the failure to incorporate the statutes or provisions of statutes as a part thereof, unless repealed by necessary implication:. . .

> (17) Occupant, entry and other land laws.

The 1875 requirement of railroads generally to provide a landowner whose property is divided by the tracks a "convenient crossing" is clearly a land law.

The Court finds that the Petitioner does not have the legal right to close the crossing. Nor does the Petitioner have the legal right to restrict the current use of the crossing by the Respondents, because said use does not constitute an interference with Norfolk Southern's use of the tracks. The interference evidence presented at trial was from delays caused by three accidents and one "near miss". A total of four instances in a 35 year period where Norfolk Southern was inconvenienced does not rise to the level of interference with Petitioner's use of the easement.

Crossing the track to get from one side to the other is clearly permissible use of the right of way by the Respondents. The Charter of the railroad and state statute require the railroad to allow passage from one side of their track to another where their track bisects a person's property.

In light of the Court's findings as to the Petitioner's claim, the Court need not address the Respondents' counterclaims seeking the value of any property interest taken and compensation for any damage to the remainder of the Respondents' property. However, the Court notes that the Respondents also seek an award of attorneys' fees [Doc. 5], but set forth no legal basis for such a claim. Accordingly, should the Respondents believe that they are legally entitled to an award of fees based on the Court's ruling, they have leave to file the appropriate motion, setting forth the legal basis for such an award, on or before January 9, 2009.

## **CONCLUSION**

The Court concludes that there is no basis in law or equity upon which to grant any of the relief sought by the Petitioner. The Court will enter a Judgment consistent with these Findings of Fact and Conclusions of Law.

**IT IS SO ORDERED.**

                    **ENTER:**

                    s/ H. Bruce Guyton
                    United States Magistrate Judge