# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE, TENNESSEE

Norfolk Southern Railway Co.,   :

                    :

        Plaintiff,     :

                    :

vs.                  :         Case No. 3:07-cv-211

                    :

John M. Harrison, et al.,    :         **Bench Trial**

                    :

        Defendants.  :

Transcript of proceedings before the Honorable H. Bruce Guyton,

U. S. Magistrate Judge, on October 27th, 2008.

Appearances:

                    On behalf of the Plaintiff:

                    Brent A. Morris,Esq.
                    Knoxville, Tennessee

                    On behalf of the Defendant:

                    R. Louis Crossley, Jr., Esq.
                    Knoxville, Tennessee

Court Reporter:

                    Donnetta Kocuba, RMR
                    800 Market Street, Suite 132
                    Knoxville, Tennessee 37902
                    (865) 524-4590

I N D E X

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| John M. Harrison | 4 | 16 | 32 | 33 |
| William L. Barringer, Jr. | 36 | 51 | 61 | 61 |
| Steve Driskell | 63 | 71 | – | |

| Defendants' Witnesses: | | |
|---|---|---|
| John M. Harrison | 74 | – |

| Plaintiff's Rebuttal Witness: | |
|---|---|
| William L. Barringer, Jr. | 76 |

| Plaintiff's Exhibits: | Identified | Received |
|---|---|---|
| 1 - Aerial Photograph-Harrison Farm | 17 | 20 |
| 2 - Aerial Photograph-Harrison Farm with Outline of Flood Area | 20 | 22 |
| 3 - Photo of Railroad Crossing and Signs | 24 | 26 |
| 4 - Photo of Railroad Crossing from Across Highway 11 | 26 | 27 |
| 5 - Photo of Railroad Crossing-Opposite View of Exhibit 4 | 27 | 28 |

Closing Arguments:

       by Mr. Morris - 78     by Mr. Crossley - 82

Recess: 62

1     (Whereupon, Monday, October 27th, 2008, Court convened in

2    the following matter at 9:05 a.m.)

3          COURTROOM DEPUTY:    We are here in a bench trial

4    in Case 3:07-cv-211, Norfolk Southern Railway Company versus

5    John M. Harrison.  Here on behalf of the Plaintiff is Brent Morris;

6    is the Plaintiff ready to proceed?

7          MR. MORRIS:  We are.

8          COURTROOM DEPUTY:    Here on behalf of the

9    Defendant is Louis Crossley; is the Defendant ready to proceed?

10          MR. CROSSLEY:  Yes, we are.

11          THE COURT:  Good morning, counsel.

12          MR. MORRIS:   Good morning, your Honor.

13          THE COURT:   Seems like I recall we discussed passing

14   on opening statements and going right to testimony; is that correct?

15          MR. MORRIS:   Yes, your Honor.

16          THE COURT:   All right.  Plaintiff's first witness,

17   please.

18          MR. MORRIS:   I'd like to call John Harrison, please.

19          THE COURT:   All right.  Mr. Harrison, if you will

20   come up here to the witness stand, the courtroom deputy will show

21   you where to stand, and then she will administer the oath to you.

22          COURTROOM DEPUTY:    Please raise your right hand.

23   Do you solemnly swear or affirm that the testimony you will give

24   in the matter before the Court today will be the truth, the whole

25   truth, and nothing but the truth; if so, please say, "I do."

1     MR. HARRISON:  I do.

2                    DIRECT EXAMINATION

3   by Mr. Morris:

4   Q.    Good morning, Mr. Harrison.

5   A.    Good morning.

6   Q.    How are you?

7   A.    Very well.

8   Q.    Would you state your name for the record, please?

9   A.    John Harrison.

10  Q.    You are the owner of Sweetwater Valley Farm in Loudon

11  County?

12  A.    Yes, sir.

13  Q.    And you own that property with your wife, Cecilia (phon.)?

14  A.    That's correct.

15  Q.    You purchased an interest in this 400-acre farm in 1987?

16  A.    Yes, sir.

17  Q.    And you had another partner at that time?

18  A.    I did, yes.

19  Q.    What was his name?

20  A.    Griff Harsh.

21  Q.    Okay.  And in 1992 you and your wife purchased the farm  in

22  its entirety and formed Sweetwater Valley Farm, Incorporated?

23  A.    Well, we purchased the partnership interest out in its entirety.

24  Q.    And you formed the corporation, Sweetwater Valley Farm?

25  A.    Yes. Yes, sir.

1   Q.    That exists today?

2   A.    Yes, sir.

3   Q.    At the time of the purchase of the property, was the farm a

4   dairy operation?

5   A.    Yes.

6   Q.    Was it exclusively a dairy farm operation?

7   A.    Yes, sir.

8   Q.    You produced and sold raw milk?

9   A.    That's right.

10  Q.    Primarily to Mayfield?

11  A.    Yes.

12  Q.    Okay.  And in 1998 you built a cheese production facility and

13  retail store, correct?

14  A.    Yes, sir.

15  Q.    And in that process you diverted raw milk from your dairy

16  production and made cheese on site?

17  A.    Yes, sir.

18  Q.    How much money did you spend in the initial development of

19  the cheese production business?

20  A.    Oh, probably, probably 600– probably 600,000.

21  Q.    Do you recall giving a deposition on October 8th of this year?

22  A.    Yes, sir.

23  Q.    Not long ago?

24  A.    Yes.

25  Q.    In that deposition you told me that you spent about a million

1  dollars in the initial development.

2  A.    Well, I think I was referring to the– the million dollars

3  included building and inventory also.

4  Q.    Okay.  So a million dollars, including the building and

5  inventory?

6  A.    Yes, sir.

7  Q.    Your initial plan at the outset was to wholesale cheeses and

8  then to provide the cheeses as corporate gifts and for fundraisers?

9  A.    That's correct.

10  Q.    And that plan changed at some point?

11  A.    Well, initially.  I think our initial business plan we did not

12  think– we did not think anybody would come to the farm, and we

13  also did not think that we would be able to wholesale to other

14  retailers.

15  Q.    Okay.

16  A.    Yes, so it has evolved over– over that ten years period of time

17  somewhat.

18  Q.    And in September of 1998 you opened a retail store in front of

19  the cheese production facility?

20  A.    Yes.

21  Q.    And when you opened that you then invited people,

22  obviously, to come to the retail store?

23  A.    Yes, sir.

24  Q.    Okay.  In the spring of '99 you began advertising for the retail

25  store and began offering farm tours?

1  A.   I can't– I can't say for sure when we originally made the farm

2  a part of the tour.

3  Q.   Okay.

4  A.   I could not give you a date to that effect.

5  Q.   In the spring of '99, though, you did begin advertising for the

6  store itself?

7  A.   Yes, yes.

8  Q.   Inviting the public to your farm?

9  A.   Yes.

10  Q.   Store hours are currently eight to six, Monday through Friday,

11  and eight to five on Saturday?

12  A.   Yes, sir.

13  Q.   You began the advertising with billboard ads primarily on the

14  interstate?

15  A.   Yes.

16  Q.   And since then you've also run radio ads about the farm?

17  A.   Yes, sir.

18  Q.   You have brochures about the farm?

19  A.   Yes, sir.

20  Q.   You have a website about the farm?

21  A.   That's correct.

22  Q.   You've done television ads about the farm?

23  A.   Yes.

24  Q.   Newspaper ads about the farm?

25  A.   Yes, sir.

1  Q.    And one time you had an advertising manager who worked for

2  you?

3  A.    We've had persons that filled those responsibilities. I would

4  not say we had a person full time doing advertising. I mean, we've

5  also had a farm– you may be referring to a firm doing the

6  advertising. Is that–

7  Q.    Oh, you out-sourced to a firm to handle your advertising?

8  A.    Yes. Yes, we did.

9  Q.    And in the past you have had cheese festivals at that farm?

10  A.    Yes, we have.

11  Q.    What do those entail?

12  A.    Well, inviting vendors and just have an afternoon on the farm,

13  basically. Maybe promoting a new cheese and promoting to tour

14  the farm.

15  Q.    How many people attend those cheese festivals?

16  A.    I couldn't– I don't know if I've answered that in deposition or

17  not. Fifteen– I don't know– 1,500, 2,000. I don't know.

18  Q.    So that was the exact number you gave me. In your answers to

19  interrogatories you said that you grossed almost four million

20  dollars in raw milk last year; is that correct?

21  A.    Yes, sir. Yes, sir.

22  Q.    And that you sold 1.2 million dollars in cheese last year?

23  A.    Yes.

24  Q.    And your business has shown growth every year for the last

25  five years pursuant at least to the interrogatories that you gave me?

1    A.    I think that's correct, yes.

2    Q.    In your estimation and experience, how many cars today use

3    this crossing as it is right now?

4    A.    I think in our– our thoughts were about 300 a day.

5    Q.    And you said that half of those vehicles are people that come

6    to the retail store or for farm tours?

7    A.    Yes.

8    Q.    So 150 vehicles a day for retail or tourism usage?

9    A.    Yes.

10   Q.    And when you say that 300 vehicles a day use the crossing,

11   tell me if I'm wrong; I'm assuming that that means that they use–

12   that they are actually visiting the farm, so they're actually using it

13   twice; is that correct?

14   A.    (No response.)

15   Q.    Did you say 300 vehicles a day use the farm?

16   A.    I think that's right. I think so. We really don't have a count

17   on that, and it varies a lot from day to day, season to season. But

18   that's to the best of our ability. That's kind of where our thinking

19   was, yes.

20   Q.    So based upon your estimation, we have approximately 600

21   crossings a date at this crossing?

22   A.    Could be, yes.

23   Q.    So assuming that, we have 300 crossings a day of tourists,

24   customers, who have been invited onto your farm by advertising or

25   other means?

1    A.    Yes.

2    Q.    You have a current business plan to expand your tourism and

3    retail business by four times its current level?

4    A.    Three, three or four times, yes.

5    Q.    And when is that going to be instituted?

6    A.    Hopefully by next late spring or summer.

7    Q.    So summer of 2009 you are hoping that your tourism or retail

8    sales have tripled or quadrupled?

9    A.    No. The number of people to the farm has tripled.

10   Q.    Okay.  So the actual traffic into the farm you want to triple or

11   quadruple?

12   A.    Yes.

13   Q.    And you plan on doing this by specifically targeting school

14   and church groups?

15   A.    That would be one, one aspect of it, yes.

16   Q.    You've said that you have turned down school groups in the

17   past?

18   A.    We don't actively promote to schools and do turn down

19   school requests, yes.

20   Q.    But you're going to begin doing that?

21   A.    We would like to begin doing that, yes.

22   Q.    Your farm is bounded by both Highway 11 and Highway 323,

23   correct?

24   A.    That's correct.

25   Q.    You submitted an exhibit list here, which I believe has

1   excellent aerial photos here.

2           MR. MORRIS:    Do you have that– I don't know. Do

3   you have this e-mailed one?

4           MR. CROSSLEY:   No.

5   Q.    I'm sure you know it, so I'm just going to assume. 323 is on

6   the western side of your farm. Am I looking at this right?

7   A.    South, 323's kind of southwest, yes, it is.

8   Q.    Southwest. And the tracks run through the southeast of your

9   farm?

10  A.    Yes.

11  Q.    And the only entrance–

12  A.    Well, they run north and south on the east side of the farm,

13  yes.

14  Q.    Okay. And the only entrance to the farm as it stands right now

15  is off of Highway 11?

16  A.    Yes.

17  Q.    And those are where your signs are?

18  A.    Yes.

19  Q.    And that's where you direct people to come to your farm?

20  A.    That's right. Yes.

21  Q.    And right there at Highway 11, when you come into your

22  farm, we have the Petitioner's railroad tracks?

23  A.    Yes.

24  Q.    If there was a driveway built off of 323 to provide access to

25  your farm, isn't it true that you are customers would not have to

1   cross the railroad tracks at all?

2   A.    Yes. Well, some of them may not have to. It would be

3   according which direction they were traveling on 323, because the

4   tracks also– 323 also crosses the railroad.

5   Q.    Oh, you're talking they might have to cross a public–

6   A.    Yes.

7   Q.    –crossing at 323? How many cows do you currently have on

8   your farm?

9   A.    About a thousand mature cows.

10  Q.    A thousand mature cows?

11  A.    Yes.

12  Q.    How many– I guess the opposite would be– immature cows do

13  you have?

14  A.    Probably 800 or 800 to 1,000 more.

15  Q.    So there are approximately 2,000 actual cows on your farm as

16  it exists today?

17  A.    Yes.

18  Q.    When you first came to the farm, how many were there?

19  A.    Probably, probably about 300, 350 mature cows.

20  Q.    Again, in your deposition, when I asked you the same

21  question, you said, "When I got involved there were 300– probably

22  200 jerseys there on the farm." So somewhere between 200 and

23  350?

24  A.    Yes.

25  Q.    In early 1998, before the production of the cheese facility and

1   the subsequent advertising, the traffic that used your crossing

2   consisted solely of dairy farm vehicles and personal use vehicles;

3   is that correct?

4   A.    Yes.

5   Q.    And now as we sit here today there are, as we've established,

6   600 crossings per day in your estimation?

7   A.    Yes.

8   Q.    Three hundred crossings of which are tourists invited to your

9   farm or using your retail store?

10  A.    That's correct. Yes.

11  Q.    Families use that crossing?

12  A.    Yes.

13  Q.    Children use that crossing?

14  A.    Yes.

15  Q.    And starting next year you plan on directly soliciting schools

16  and churches to use that crossing?

17  A.    Yes.

18  Q.    In 2006 there was an accident at this crossing that involved an

19  invitee to your property; is that correct?

20  A.    I think I– I think I said in my deposition that– I don't know if

21  it was invitee or if it was a person visiting an employee that I had .

22  I was under the impression it was a person visiting an employee.

23  Q.    But it was not an employee?

24  A.    No. That's right.

25  Q.    It was not–

1    A.    Yes.

2    Q.    –your personal guest?

3    A.    Yes.

4    Q.    And I believe that there was an incident report to that attached

5    as an Exhibit Six to the exhibits that you have provided today.

6    Were you there for that incident?

7    A.    No, sir.

8    Q.    Were you informed of the incident when it happened?

9    A.    I think my wife and I were in Knoxville.  We got back to the

10   farm pretty quick.

11   Q.    And do you have any idea how long the train was delayed

12   after the accident at your crossing?

13   A.    No, sir.

14   Q.    In the mid 1990s you told me that one of your employees was

15   struck by a train after he pulled too close to the tracks?

16   A.    Yes.

17   Q.    Were you there for that incident?

18   A.    Yes.

19   Q.    Do you have any idea how long the train was delayed that

20   day?

21   A.    No.

22   Q.    You told me you had personal knowledge of a fatality at this

23   crossing in the 80s?

24   A.    Yeah.  I was under the impression the facility was at the

25   north– next crossing north of there.

1  Q.     That's because you have two, two crossings on your property?

2  A.     Yes.

3  Q.     And the second one is used solely for farm traffic, and I think

4  you said there's one residence back there; is that correct?

5  A.     There's another landowner back there, yes, that uses that

6  crossing; different farm, different landowner.

7  Q.     Okay. And last year you told me your neighbor was nearly

8  struck by a train and that train actually threw its brakes that day?

9  A.     Yes.

10  Q.     How long was the train delayed that day?

11  A.     I would say a couple of hours, probably.

12  Q.     Mr. Harrison, isn't it true that up until your decision to open a

13  retail and tourism facility that your traffic, you estimated, was still

14  approximately 150 vehicles a day, being dairy farm usage?

15  A.     I don't think I've estimated what it was prior to '98.

16  Q.     Was it lower than 150?

17  A.     Could have been. The operation, the farm operation, was

18  smaller then, real smaller then.

19  Q.     Okay. But you have told me, though, that upon the opening of

20  your retail store and the invocation of your advertising campaign,

21  the traffic effectively doubled at your crossing?

22  A.     Yes.

23  Q.     Have you ever paid any sum of money to the railroad for the

24  cost and maintenance of the crossing or the expansion of this

25  crossing to accommodate your increased traffic?

1    A.    No, sir.

2    Q.    Have you entered in any sort of agreement with the railroad at

3    any time concerning the maintenance or use of this crossing?

4    A.    No, we have not.

5    Q.    And have you ever personally worked on this crossing

6    yourself?

7    A.    No, sir.

8         MR. MORRIS:   Nothing further.

9         THE COURT:   All right.  Thank you, counsel.  Cross-

10   examination for this witness, please?

11        MR. CROSSLEY:   May it please the Court, before I

12   begin cross-examination, I would like to introduce Ms. Celia

13   Harrison, that's sitting at the end of the table of the court; and the

14   Court, I believe, knows Paul Harrison, who is sitting back inside

15   the bar.

16        THE COURT:   All right.  Good morning.

17                     CROSS-EXAMINATION

18   by Mr. Crossley:

19   Q.    Mr. Harrison, we had a nice, little outline prepared of what I

20   was going to ask you, and since Mr. Morris elected to go first, I'm

21   going to have to kind of skip around.  How long have you lived in

22   Loudon County?

23   A.    All my life, with the exception of a couple years I was in

24   Monroe County.

25   Q.    How long is all of your life?

1    A.    I'll be 50 next year, so–

2    Q.    Are you from a farm and family down there?

3    A.    I am, yes.

4    Q.    How many generations of farmers in your family down in

5    Loudon County?

6    A.    Six or seven.

7    Q.    Okay.  Let's talk about where the farm's located for a minute,

8    and I'm going to refer to what's been marked as Exhibit One.  Do

9    you see that on the screen?

10   A.    Yes, sir.

11   Q.    Okay.  Does it need to be focused or–

12   A.    It's a little bit fuzzy, but I can make it out, I think.  That's

13   better.

14   Q.    Okay.  The white line, what does that represent?

15   A.    That's the property boundaries of the Shandel (phon.) farm.

16   Q.    This yellow road here, what is that?

17   A.    It's 323.

18   Q.    If you go all the way out here, where do you go?

19   A.    Well, it takes you to the interstate and then becomes, I guess,

20   Pond Creek Road.

21   Q.    Okay.  Is that Interstate 75 South?

22   A.    South and north, yes, sir.

23   Q.    Okay.  And is the exit that 323 would take you to, is that Exit

24   68?

25   A.    Yes, sir.

1    Q.    The yellow line that's running kind of southwest and

2    northeast, what is that?

3    A.    It's Highway 11, State Highway 11.

4    Q.    And that's what ultimately becomes part of Kingston Pike

5    once you get all the way up to Knoxville; is that–

6    A.    It is, yes.

7    Q.    Now, you own property on both sides of Highway 11?

8    A.    Yes.

9    Q.    The red line that goes also southwest to northeast, what is

10   that?

11   A.    That's the railroad.

12   Q.    Okay.  Those are the tracks we're talking about?

13   A.    Tracks, yes.

14   Q.    Okay. Let's see. The blue meandering that my pen is

15   following, what is that?

16   A.    Sweetwater Creek.

17   Q.    And is there water in that year round?

18   A.    There is, yes.

19   Q.    Now, if you can follow my pen a little bit, do you see this

20   fence row or row of trees right here?

21   A.    Yes.

22   Q.    Water flow there as well?

23   A.    Yes.

24   Q.    This fence row here that I'm outlining, does water flow there

25   as well?

1    A.    It does, except in extremely dry times, like this year.

2    Q.    Where those two meet, they go underneath the railroad track;

3    is that right?

4    A.    Yes.

5    Q.    And then on the other side of the railroad track they flow a

6    little bit further as a combined flowage until it meets Sweetwater

7    Creek; is that correct?

8    A.    That's correct.

9    Q.    Okay. I've zoomed in a little bit. Where my pen's tracing, is

10   that the driveway we're talking about?

11   A.    It is.

12   Q.    And then, once it reaches the northwest side of the tracks,

13   does it split?

14   A.    Yes.

15   Q.    And if you follow the right hand split, where does that lead?

16   A.    The right hand side goes to our home.

17   Q.    Okay. And that's marked on this as "Residence;" is that

18   correct?

19   A.    Yes, sir.

20   Q.    And the left hand split goes where?

21   A.    It goes to the rest of the dairy facilities and cheese facility.

22   Q.    wherever it says, "Retail Center," what is that?

23   A.    That is the– well, I'm assuming that's the cheese plant and the

24   retail store.

25   Q.    Okay. And right there where the tip of my pen is, is that the

1  cheese store?

2  A.    It is.

3  Q.    And then all these other buildings in here have– are part of the

4  dairy operation?

5  A.    That's correct.

6  Q.    And does this map with these overlays accurately reflect the

7  layout of your farm?

8  A.    It does, yes.

9  Q.    At the present time?

10  A.    Yes.

11        MR. CROSSLEY:    Your Honor, we'd offer that as

12  Exhibit Number One.

13        THE COURT:   Any objection?

14        MR. MORRIS:   No.

15        THE COURT:   All right.  The exhibit will be received

16  as Exhibit One.

17        (Defendant's Exhibit Number One received.)

18  Q.    Okay.  Mr. Harrison, I'm going to show you a second aerial

19  view, which is identical to the one we just looked at.  This has been

20  premarked as Exhibit Number Two.  The only difference is it has

21  some areas that have been shaded in or colored a very light blue

22  and have denominated a flood area.  Could you explain what that

23  represents?

24  A.    I think those shaded areas represent areas that potentially are

25  under water during the heavy rain events.

1   Q.    Okay.  In order to go from the farm buildings, your residence

2   or the retail center and get to State Highway 323, without crossing

3   the railroad tracks, you would have to cross that flood area; would

4   you not, sir?

5   A.    That's correct.

6   Q.    And how deep does it get out there when it floods?

7   A.    Oh, six– probably six to ten feet.

8   Q.    So in order to cross from your house, the cheese center and

9   the farm buildings to across that area to 323, would you have to

10  build essentially a bridge over that area at least ten feet in height?

11  A.    Yes.

12        MR. CROSSLEY:   Your Honor, we'll offer that as–

13  A.    I'm going to say I don't know.  I want to go back and say I

14  really don't know, but I would suspect it would be that high, would

15  have to be that high.

16  Q.    Have you ever had any engineering studies done to determine

17  how high that would need to be?

18  A.    No. No, sir.

19        MR. CROSSLEY:   Your Honor, we'll offer that as

20  Exhibit Number Two.

21        THE COURT:   Any objection?

22        MR. MORRIS:   Well, your Honor, I don't know who

23  prepared the exhibit, so I'm not sure that I am totally comfortable

24  with this blanket flood area being called such without some

25  testimony as to how large the flood area is.  We know how deep it

1    is, but I don't know how wide it is.

2              THE COURT:   Well, he just testified to it.  Any other

3    objection to it?

4              MR. MORRIS:   No, your Honor.

5              THE COURT:   All right.  The exhibit will be marked as

6    Exhibit Two and received into evidence.

7         (Defendant's Exhibit No. 2 received.)

8    Q.   All of the boundary line that we looked at on Exhibit Number

9    One, about how many acres total do you have on your farm?

10   A.   It's about 580 acres.

11   Q.   And who did you acquire it from?

12   A.   Dr. Griff Harsh.

13   Q.   Did you start out– well, when was your first association with

14   Dr. Harsh as it relates to this farm, about what year?

15   A.   It was in '87.

16   Q.   And what was your relationship, what relationship did you

17   form with Dr. Harsh in '87?

18   A.   We formed a partnership to basically give him a vehicle to get

19   out of the farming operation and for myself and my wife to get into

20   it.

21   Q.   Okay.  Did you know Dr. Harsh prior to getting into that

22   relationship?

23   A.   Just, just knew who he was.

24   Q.   Okay.  And what type of use was he making of the farm?

25   A.   It was a dairy farm.

1  Q.    Okay.  What relationship did you have with Dr. Harsh again?

2  A.    We were partners.

3  Q.    Partnership?

4  A.    Yes.

5  Q.    And at some point did you buy Dr. Harsh out?

6  A.    We bought his interest in the partnership in 1992.

7  Q.    When Dr. Harsh–

8  A.    I'll also say– you asked.  Dr. Harsh was always involved in

9  animal genetics, and at that time it was a jersey– it was also a

10 jersey breeding operation.  So he had pedigreed, pedigree jerseys.

11 Q.    Did he hold cattle auctions on the farm?

12 A.    Prior to that he had pedigreed Herefords, I think, and had

13 auctions on the farm then.  I don't know– I don't know what extent

14 he marketed the jersey cattle.  I don't know much about that.

15 Q.    What's the volume of milk that you currently produce on your

16 farm?

17 A.    About 18 million pounds annually.

18 Q.    How many pounds in a gallon?

19 A.    Eight, 8.6.  It's about 6,000 gallons a day, between six and

20 7,000 gallons a day.

21 Q.    Okay.  And how many of those six or 7,000 gallons a day are

22 used in your cheese operation?

23 A.    Oh, ten to 15 per cent, generally.

24 Q.    Okay.  So five to 600 gallons are used in your cheese

25 operation, roughly?

1    A.    Well, it's not necessarily based on daily production, but

2    annual production.

3    Q.    Okay.  Do you produce cheese every day?

4    A.    No. Probably about 50– 50 to 60 days a year.

5    Q.    And those 50 or 60 days when you're producing cheese, are

6    you drawing milk out of your dairy production?

7    A.    We are.  Generally we are, yes.

8    Q.    And the rest of the milk you produce leaves the farm; does it

9    not?

10   A.    Yes.

11   Q.    How does it leave the farm?

12   A.    We have a truck that takes it to the Athens Mayfield/Dean

13   Foods plant.

14   Q.    How many gallons will your truck hold?

15   A.    Seven thousand gallons.

16   Q.    Okay.  So once a day you're taking milk out?

17   A.    Yes.

18   Q.    Let me show you what has been premarked as Exhibit Number

19   Three.  What does that show?

20   A.    That's coming into the farm, leaving Highway 11.

21   Q.    Okay.

22   A.    It's the cheese facility on the left and our residence on the

23   right.

24   Q.    Okay.  Is this the cheese facility here?

25   A.    Yes, it is.

1    Q.    And is that part of your residence?

2    A.    Yes.

3    Q.    And these signs, where did these signs come from?

4    A.    I think, originally, we put up the smaller "Stop" and

5    "Railroad" signs and–

6    Q.    Those the ones I'm pointing to with my pen?

7    A.    Yes.

8    Q.    You put those up yourself?

9    A.    Yes.

10   Q.    And what about this sign post?

11   A.    I think at a later date they put those up. I'm not sure of what

12   date.

13   Q.    Who's "they"?

14   A.    The railroad put those up.

15   Q.    Back up here you have a set of cross-bucks and "RR" and two

16   lines painted on the driveway. Where did that come from?

17   A.    We had those put there also.

18   Q.    "We," meaning you?

19   A.    I did, yes.

20   Q.    The railroad pay you for that?

21   A.    No, sir.

22   Q.    Here where the asphalt is a little bit blacker than up here, who

23   put that asphalt down?

24   A.    The railroad.

25   Q.    Does this accurately, this picture, accurately portray the

1    signage for the railroad that's out at your farm today?

2    A.    It does, yes.

3              MR. CROSSLEY:    Your Honor, we'd offer that as

4    Exhibit Number Three.

5              THE COURT:    Any objection?

6              MR. MORRIS:    No, your Honor.

7              THE COURT:    All right.  The document will be marked

8    as Exhibit Three and received into evidence.

9         (Defendant's Exhibit No. 3 received.)

10   Q.    This has been premarked Exhibit Number Four.  What does

11   this show, Mr. Harrison?

12   A.    That's the same entrance; it's just pictured from across

13   Highway 11.

14   Q.    And this is the cheese–

15   A.    It is.

16   Q.    –production area and retail store, and this is your residence?

17   A.    Yes.

18   Q.    And here where you have the asphalt painted with a cross-

19   buck and "RR" is two lines, did you have that painting done as

20   well?

21   A.    I did.

22   Q.    Does this picture accurately represent your farm and this

23   crossing as it exists today?

24   A.    It does.

25             MR. CROSSLEY:    Your Honor, we'd offer that as

1  Exhibit Number Four.

2          THE COURT:   Any objection?

3          MR. MORRIS:   No, your Honor.

4          THE COURT:   All right.  The document will be marked

5  as Exhibit four and received in evidence.

6      (Defendant's Exhibit No. 4 received.)

7  Q.    Here is what's been premarked as Exhibit Number Five, and

8  what is that a view of?

9  A.    That's the opposite view, coming out, going back toward

10  Highway 11 from the split in our driveway.

11  Q.    Okay.  And same sequence of signs that we looked at close up

12  going in?

13  A.    Yes.

14  Q.    And I think this more clearly shows the area where the

15  railroad has maintained the asphalt, because it's darker; is that–

16  A.    Yes, sir.

17  Q.    And does that accurately reflect the conditions at that

18  crossing as they exist today?

19  A.    It does.

20          MR. CROSSLEY:   Your Honor, we'd offer that as

21  Exhibit Number Five.

22          THE COURT:   Any objection?

23          MR. MORRIS:   No, your Honor.

24          THE COURT:   The document will be marked as Exhibit

25  Number Five and received in evidence.

1      (Defendant's Exhibit No. 5 received.)

2   Q.    I want to go back briefly to Exhibit Number One, Mr.

3   Harrison.  This driveway here is the only driveway that, by paving,

4   serves your residence, the retail center and the farm buildings?

5   A.    That's correct.

6   Q.    Now, up here, right at this white line, is there another

7   crossing up there?

8   A.    Yes.

9   Q.    Is that a paved crossing?

10  A.    Well, it is a graveled driveway, but the railroad has paved the

11  same part there that–

12  Q.    Where it crosses the tracks?

13  A.    Yes.

14  Q.    But on either side of the tracks?

15  A.    It's gravel, it's dirt.

16  Q.    Okay.  You see where the tip of my pen is up there at the top?

17  A.    Yes.

18  Q.    What is that?

19  A.    That's the– that's the residence of the property behind me that

20  uses that crossing– that basically has a right-of-way through our

21  farm and across, across the railroad there.

22  Q.    Okay.  Other than accessing these fields, do you use that

23  crossing for any purpose?

24  A.    That's the only reason, yes.

25  Q.    Do visitors–

1    A.    No.

2    Q.    –either to your farm or to your cheese operation use that

3    crossing?

4    A.    No, sir.

5    Q.    The driveway that's there, has it been there as long as you can

6    remember?

7    A.    Yes.

8    Q.    Are people coming to your farm to visit the dairy farm

9    operations as opposed to coming in to buy cheese?

10    A.    To do both.

11    Q.    To do both.  Have you recently had a 4-H "Fun Day"?

12    A.    We agreed to host the 4-H "Farm Day."

13    Q.    And what was that?

14    A.    Well, it's a program that the farm bureau implements that

15    exposes the third or fourth graders to farm– basically to a farm, to

16    agriculture.

17    Q.    To the dairy side of the farm?

18    A.    Even, even more so than that.  There was a beef and chicken

19    and hog and sheep exhibits, and just agriculture in general.  We

20    provided the location for that to happen.

21    Q.    Would that have taken place on your farm regardless of

22    whether you had a cheese operation?

23    A.    Yes, sir.

24    Q.    Approximately how many children did that draw?

25    A.    Six hundred Loudon County fourth graders.

1    Q.    Do you have a brother, Steve?

2    A.    I do.

3    Q.    And what does he do?

4    A.    He owns the farm where I grew up.  It's an operating dairy

5    farm also.

6    Q.    Is that down off Highway 72?

7    A.    It is.

8    Q.    And does he have people come to visit his farm to see his

9    operation?

10   A.    He does.

11   Q.    Does he have any cheese?

12   A.    No.

13   Q.    So it's not unusual for people to come visit large dairy farms

14   regardless of whether they have a cheese operation or not?

15            MR. MORRIS:   Objection, leading.

16   A.    That's correct.

17            THE COURT:   Overruled, overruled.  You can answer.

18   A.    That's correct.

19   Q.    Do you take steps to try to make your property as safe as you

20   can  to your family and your employees and the people that come

21   visit you?

22   A.    We do.

23   Q.    Tell the Court some of the things that you have done over the

24   years to try to help make your farm safer as it relates to railroad

25   tracks?

1  A.    Well, if we have a new hire, we discuss the railroad being an

2  issue, being a safety issue.  We work to keep the visibility, the

3  fence row cleaned and the vegetation maintained.  We post

4  railroad safety brochures in our retail facility.

5  Q.    Okay.  In your–

6  A.    Provide a space for railroad safety information.

7  Q.    Okay.  And your retail facility, do you have a little rack where

8  you have brochures for things like LLASE (phonetic)?

9  A.    We do.

10  Q.    Just like you see in tourist places?

11  A.    We do.

12  Q.    And one of those is for railroad safety brochures?

13  A.    It is.

14  Q.    What else, if anything?

15  A.    Well, we lecture our children pretty hard on using the

16  railroad.

17  Q.    Okay.  How many children do you have?

18  A.    Five.

19  Q.    What are their ages or their age range?

20  A.    You would ask me this.

21  Q.    What's their range.

22  A.    Oh, 17 to 7 to 8, I guess, now.  No?  My wife's shaking her

23  head.

24         THE COURT:   The Court will accept that as

25  approximates.

1    Q.    I think that's all, Mr. Harrison, for right now.

2    A.    Okay.

3              THE COURT:   Counsel, do you have some more

4    questions for this witness?

5              MR. MORRIS:    Yes, sir, very briefly.

6                      REDIRECT EXAMINATION

7    by Mr. Morris:

8    Q.    Mr. Harrison, what's been marked already as Exhibit Two– is

9    this backwards? Does that look all right? Has anyone told you that

10   it will be impossible for you to build a road from your residence

11   and farm operation across what is marked "flood area" and into

12   323?

13   A.    No, sir.

14   Q.    Take a look at what has been marked, I believe, Exhibit

15   Number Five.  This is looking out of the driveway to your farm,

16   correct?

17   A.    Yes.

18   Q.    This farm behind Highway 11 there, do you own that?

19   A.    I do, yes.

20   Q.    So it would be possible for you to place a retail store on that

21   location because you own that land, and therefore prevent people

22   from having to cross the tracks to get to your cheese store; is that

23   correct?

24   A.    Yes.

25              MR. MORRIS:    Thank you. Nothing further.

1            THE COURT:  Mr. Crossley?

2            MR. CROSSLEY:    No further questions at this time,

3    your Honor.

4            THE COURT:    How do you keep your cows off the

5    track? Is there a fence that goes along the whole length of the

6    track?

7            THE WITNESS:    There is, but it can be an issue at

8    times. We have had cattle struck on the railroad track. There is a–

9    this summer we did clean out a longer, longer area, so right now

10   there is no fence going south down the railroad track part of the

11   way.

12           THE COURT:    But between your residence– your lawn,

13   basically, flows into the tracks?

14           THE WITNESS:    Yes.

15           THE COURT:    There's nothing to separate it?

16           THE WITNESS:    Yes, sir.

17           THE COURT:    Any questions based on the Court's

18   questions?

19           MR. MORRIS:    No, your Honor.

20           MR. CROSSLEY:    If I could.

21                          RECROSS-EXAMINATION

22   by Mr. Crossley:

23   Q.    Mr. Harrison, this area here, you see where I'm kind of

24   hovering with my pen?

25   A.    Yes.

1    Q.    You have cows grazing in that area?

2    A.    We, at times, at times we do, yes.

3    Q.    Okay. This area up in here, is that pasture or crop land?

4    A.    It's crop, crop production area.

5    Q.    So there would not be cows grazing up in here?

6    A.    That's right.

7              THE COURT:  Mr. Crossley, could you re-ask those

8    last two questions in a way in which the court reporter can identify

9    what you're talking about?

10             MR. CROSSLEY:   Okay.

11             THE COURT:   I mean, I can see what you're saying, as

12   you're circling those two areas.

13             MR. CROSSLEY:   Okay.

14             THE COURT:   But if the record's prepared, no one

15   would know.

16             MR. CROSSLEY:   Okay.

17   Q.    If you hold Exhibit One where it's taller than it is wider,

18   which is the way it's being displayed on the projector, the large

19   brownish area that is in the upper northeast quadrant of your farm

20   is what you've identified as the pasture land– I mean, the crop

21   land? Excuse me.

22   A.    Yes.

23   Q.    And what I was initially showing where my pen was hovering

24   is the green area where the driveway is where it says "Retail

25   Center," and to the southeast of the farm buildings. That's where

1  you identified at times you have had cows graze in that area?

2  A.    Yes.

3  Q.    The land that is to the northwest of Sweetwater Creek, is that

4  an area where most of your cows do their grazing?

5  A.    Well, it's an area where there's cattle. There is cattle grazing.

6  They are on that all the time, yes.

7  Q.    Okay. And, likewise, the area between the railroad track and

8  323 to the southeast of Sweetwater Creek is an area you also graze

9  cows?

10 A.    Yes, sir. Yes.

11 Q.    Now, could you estimate there, right where the railroad tracks

12 meet the area that's just to the northeast of 323– and I'm talking

13 about the land that is to the west of the railroad tracks– how far, if

14 you're down there where that wet weather conveyance is, how far

15 above your head would you estimate the railroad tracks are?

16 A.    There's probably an area there that the railroad tracks have a

17 fill of 25 or 20, 25 feet maybe or 30 feet. Pretty high.

18 Q.    Now, when it floods, it doesn't flood the railroad tracks, does

19 it?

20 A.    That's right.

21 Q.    They're up high enough?

22 A.    Yes.

23        MR. CROSSLEY:    Nothing further.

24        THE COURT:    Counsel, any questions based on his

25 questions?

1      MR. MORRIS:   No, your Honor.

2      THE COURT:   All right, sir. Thank you for your

3  testimony.  You may step down.

4      (Witness excused.)

5      THE COURT:   Next witness for the Plaintiff, please.

6      MR. MORRIS:   Your Honor, I neglected at the outset

7  to introduce our witnesses.  This is William Barringer and Steve

8  Driskell from Norfolk Southern.  I'd call William Barringer now to

9  the stand.

10     THE COURT:   All right, sir. Step up to be sworn.

11  Madam Clerk, would you please swear the witness?

12     COURTROOM DEPUTY:   Yes, your Honor. Please

13  raise your right hand.  Do you solemnly swear or affirm that the

14  testimony you will give in the matter before the Court today will be

15  the truth, the whole truth, and nothing but the truth; if so, please

16  say, "I do."

17     MR. BARRINGER:  I do.

18                     DIRECT EXAMINATION

19  by Mr. Morris:

20  Q.    Would you state your name for the record, please?

21  A.    Yes, sir.  My name is William Barringer.

22  Q.    And who is your employer?

23  A.    Norfolk Southern Corporation.

24  Q.    What is your position there?

25  A.    I am director of grade crossing safety for Norfolk Southern.

1  Q.    Please explain to the Court what it is that your job entails.

2  A.    My job is being responsible and being a liaison for the

3  corporation in matters involving grade crossing safety issues with

4  the State Department of Transportation, local communities, private

5  citizens.  We follow up with our education teams that education the

6  public on the hazards of grade crossings.

7        We deal with our engineering folks on building of grade

8  crossings.  We work sometimes with building of bridges with our

9  engineering folks.  We work with our law enforcement side, both

10  internal police and external, on trespassing matters and also grade

11  crossing safety blitzes.

12        We cover 22 states, a province of Canada, the District of

13  Columbia.

14  Q.    Where are you located out of?

15  A.    My office is located at Roanoke, Virginia.

16  Q.    Is that the headquarters of Norfolk Southern?

17  A.    That is one of the headquarters.  We have headquarters in

18  three different cities.

19  Q.    Is it fair to say that almost all of your work concerns grade

20  crossings as they exist?

21  A.    Yes, sir, it is.

22  Q.    In the course of your work do you monitor private grade

23  crossings for Norfolk Southern?

24  A.    Yes, sir.  We are involved in our grade crossings, private

25  crossings, Norfolk Southern.  We have about 10,000 of them in NS.

1   Q.    Ten thousand private grade crossings?

2   A.    Yes, sir, we do.

3   Q.    Is it your job to attempt to monitor those 10,000 grade

4   crossings as best you can?

5   A.    I am one of many people it involved, yes, sir.

6   Q.    Do you have any specific knowledge of the crossing that

7   forms the basis of this action?

8   A.    Yes, sir, I do.

9   Q.    What's that crossing's specific DOT number?

10  A.    If I may look at my notes, this crossing is DOT number– a

11  DOT number is an inventory system assigned by the Federal

12  Railway Administration.  It's a seven-digit number in this case; it's

13  721524E.

14  Q.    Have you personally been to this crossing?

15  A.    Yes, I have.

16  Q.    Are you familiar and have documented incidents at this

17  crossing?

18  A.    Yes, sir, I have.  You're referring to the incidents of crossing

19  accidents?

20  Q.    Yes, sir.

21  A.    Yes, sir, I have.

22  Q.    How many have there been?

23  A.    There have been three.

24  Q.    Could you briefly tell us about those three accidents as you

25  know them to be?

A.    Yes, sir.  If I may refer to the Federal Railway Administration report on these incidents.  We've already talked about an incident happened in May 27th of 2006.  It involved a motor vehicle stopped on the crossing–

MR. CROSSLEY:    Your Honor, I'm going to object to this witness testifying about what happened at an accident unless he can– Mr. Morris can lay the foundation that the witness was there.

MR. MORRIS:    Your Honor, this is a government-prepared document that's available to the public.  Norfolk Southern has a duty to provide the information that's used in this document, and obviously we've shown that this is what he specializes in, is occurrences at grade crossings.

So I think, to the extent that he's only going to reflect the information in the document, I don't believe it's objectionable.

THE COURT:    I think I'll overrule the objection.  I think he can testify about it in terms of what notice the railroad has received.

Q.    So we're on 2006?

A.    Yes, sir.  The accident happened at 4:15 p.m., it involved a– one of our trains with three locomotives and 94 cars going an estimated speed of 40 miles an hour, struck a vehicle that was driven by a 54-year-old male.  In that incident there was $12,000 of damage reported to the highway vehicle.

On September 23rd of 1993 another incident occurred

1    involving an auto. The train consisted of four locomotives, 108

2    cars, estimated speed at the time of the accident was 30 miles an

3    hour. A male driver, no age was reported, and no injuries reported

4    or damage reported on that particular incident.

5          The last incident was September 8th of 1983 involving an

6    auto–

7          THE COURT: On that last one, you're saying a train

8    going 30 miles an hour hit a car and there was no damage?

9          THE WITNESS: No damage reported.

10         THE COURT: All right. No damage reported. Sorry if

11    I misunderstood you. Go ahead.

12         THE WITNESS: And, your Honor, it may be the fact

13    that over the years the Federal Railway Administration has

14    changed reporting thresholds. The cost goes up, so this may not

15    have met the threshold back then.

16         THE COURT: All right. Thank you.

17         THE WITNESS: Yes, sir.

18    A. (Continuing) On September 8th, 1993, a car was involved in an

19    accident, one locomotive and 34 cars, estimated speed at the time

20    of the accident was 35 miles an hour. In that particular case there

21    were two fatalities. Estimated vehicle damage at that point was

22    $10,000.

23    Q. Are you familiar with the policies of Norfolk Southern

24    concerning private crossings used for commercial purposes

25    throughout the country?

1   A.   Yes, sir.

2   Q.   Would you–

3   A.   One–

4   Q.   Sorry.  Just if you could tell us what those policies are.

5   A.   One of the duties that we're involved with are negotiations

6   with entities who wish to cross our railroad tracks either to have

7   easements or driveways across our tracks for private use.  In many

8   cases you deal with maybe industrial firms and developments,

9   private developers.

10          And we try to do– first off, we start out by saying no, because

11   we're trying to eliminate as many grade crossings as we can

12   because they represent an opportunity for collision there. If they

13   cannot find alternate access and work with the developer or the

14   citizens to try an alternate access, then we will work to establish an

15   agreement for that crossing that lays a foundation on liability,

16   indemnification and depending on the nature of the crossing and

17   the traffic that's going to be there, the installation of automatic

18   warning devices on that particular crossing.

19   Q.   In the case, in the course of your work, have you become

20   familiar with the costs associated with incidents in grade crossing

21   accidents?

22   A.   Yes, sir, I have.

23   Q.   Generally speaking, what is the cost to the railroad directly of

24   a grade crossing accident?

25   A.   We did an analysis for this incident– or for this crossing

1    based on a three-month rolling average of the number of trains that

2    go over this crossing.  If an accident occurs, there are– or a near-

3    miss occurs there, we have to stop the train.  Approximate time

4    length is anywhere from two and a half to three hours in stopping.

5    That average cost for the cars that are on the train, which are not

6    our cars– you know, they are rented out to different people who

7    ship the products– the cost of locomotive, the fuel, the crew,

8    averages about $1,000 a train for a three-hour delay.

9         This crossing sees an average of 15 to 20 trains per day.  One

10   incident at that crossing is approximately $16,000 for a three-hour

11   delay just for that particular crossing incident.

12   Q.    What sort of accident would assume a three-hour delay?

13   A.    It could be as simple as the engineer having to put the train

14   into emergency.  That's an emergency application of the brakes.

15   It's an uncontrolled operation where the engineer basically

16   releases all the air of the train and causes the brakes to come on on

17   the train.

18        Federal rules and Norfolk Southern internal rules require our

19   crews to physically walk the train and inspect every set of wheels,

20   both sides of the train, before they can operate again.  That's so

21   that they insure that the train has not been derailed.

22        Typical train today is about a mile and a half long, so our

23   conductor, who is in charge of the train, would have to walk both

24   sides of the train.  So you're talking about a three-mile walk.  And

25   if you know the railroad, it's ballast conditions, heavy rocks,

1   uneven conditions, so it takes him a couple hours to do the train

2   walk.

3   Q.    So even if there has not been an accident, you're suggesting

4   that it be a three-hour solely because of the application of the

5   brakes?

6   A.    It could be. For a non– non-vehicle incident, it may be a little

7   bit less. It also depends on the length of the train.

8   Q.    Is there a risk of derailment on a train solely based upon the

9   application of the brakes?

10  A.    Any time you have an uncontrolled application of the brakes,

11  you have a chance of derailing the train.

12  Q.    Do you have any idea or could you even estimate the cost to

13  the railroad of a derailment?

14  A.    One wheel derailment not involving other cars, equipment,

15  you know, a couple thousand dollars. A major derailment

16  involving 50 to 60 cars could be in the millions and millions of

17  dollars.

18  Q.    Are you familiar with the term "wagon way"?

19  A.    Yes, sir, I am.

20  Q.    Does that term have any significance to you at all as director

21  of grade crossing safety for Norfolk Southern?

22  A.    Yes, sir.

23         MR. CROSSLEY:    Now, your Honor, I'm going to

24  object to that to the extent they're trying to use a Norfolk Southern

25  definition for a charter that was enacted in 1835.

1          MR. MORRIS:   Well, your Honor, I believe his

2     testimony is going to bring light to the fact that it's an industry

3     term and not just a term used in charters.

4          THE COURT:   I understand. I mean, I don't think his

5     personal interpretation's binding on the Court as a matter of law.

6     But I think if it's part of his job every day to go out and look at

7     wagon ways, I think he can tell the Court his understanding of that

8     term.

9          MR. MORRIS:   Thank you, your Honor.

10          THE COURT:   May or may not be probative of

11     anything.

12     Q.    What does the term "wagon way" mean to you in the course of

13     your employment?

14     A.    During the course of the history of the railroad– it started out

15     when, you know, surveyors were out there laying the railroads in

16     this country, early 1800s, 1700s. In that time, we didn't have the

17     automobiles and trucks we do today; you had wagons.

18          And when the surveyors were out there and the people were

19     out there, they would have discussions on how they would get their

20     farm equipment across the railroad, and the term came into being as

21     a wagon way so that farmers and other people who could drive their

22     wagon from one side of the tracks to the other side.

23          Today it's evolved into the term used for private crossings,

24     private driveways. Of course, we don't use very many wagons

25     today. We still have some in Amish country, but it's basically the

1    term we use today as a private crossing versus wagon way.

2    Q.    And did you just say that a wagon way, as you understood it,

3    is for personal use?

4    A.    That's what it was originally designed for. It was designed

5    for farmers to get their vehicles, their wagons at that time, from

6    one side of the tracks to the other.

7    Q.    Now, how large is a wagon way as used today?

8    A.    Typically, you see a private crossing for residential use of

9    about eight feet. The crossing timbers that we use to build the

10   crossing are eight feet in length. For a low-use crossing our

11   engineering folks will lay in one set of timbers and put down

12   asphalt between the ties and the rail.

13   Q.    Based upon your personal observation, what would you

14   estimate the size of the crossing at Sweetwater Valley Farms to be?

15   A.    I believe its crossing's about 16 feet, I believe. There's about

16   two sets of timbers at this crossing.

17   Q.    How many private crossings do you currently have within

18   your system that are formed under what you would term "wagon

19   ways"?

20   A.    We have about 10,000 private crossings, and I would say fully

21   9,500 or more are those wagon way or private kind of driveway

22   type crossings.

23   Q.    In those kind of crossings what sort of vehicle traffic would

24   you estimate that they would receive?

25   A.    In my job, we usually say that a residence, one residence, will

1    generate eight trips a day, eight vehicle trips a day, four out and

2    four back, over a crossing.

3    Q.    And those residential household members using the crossing,

4    would you assume that they would be familiar with the crossings as

5    they're using it that often?

6    A.    Yes, sir.  Usually they are typically the people who live there,

7    they hear the trains, they see the trains, they're involved with the

8    railroad.  Over the years, the railroad comes through and has to tear

9    the crossing up for maintenance, so in some cases they become

10    very familiar with the local track supervisor who has charge of

11    maintenance on that crossing.

12    Q.    As we have defined the term and the usage in railroad

13    operations, is the Sweetwater Valley crossing a wagon way as you

14    understand that term to be?

15    A.    No, sir.  I would not classify it as a wagon way crossing any

16    longer.

17    Q.    In your experience, the use and nature of the Sweetwater

18    Valley crossing, is that use and nature consistent with the term

19    wagon way as you use it?

20    A.    No, sir, it's not.

21    Q.    Is this crossing, is it fair to describe it as a concern, potential

22    concern, for public safety for the railroad?

23    A.    I would say that it's not so much a public safety issue as it is a

24    user safety issue, and it's not because the crossing is unsafe.  I

25    mean, the crossing is safe today for a motorist who complies with

1    the obligation of the signs presented to him.

2         The safety concern rests with outside folks who have been

3    invited to come to this property, who are unfamiliar with this

4    particular crossing.  This may be the first time they've ever come

5    to this crossing, maybe the last time they'll ever see this crossing.

6         One of the things we try to do is educate people on the

7    dangers of crossing and what they have to look for.  This particular

8    crossing has a stop sign on it, which we installed in 2006. It also

9    has a railroad crossbar underneath that white sign.  You have seen

10   those in the pictures.

11        We designed that sign in conjunction with the manual for

12   uniform traffic control devices, a regulatory sign.  We also put a

13   "look" arrow on that sign, so it would ask the motorist to come to

14   that sign, stop and look in both directions before proceeding.

15        The point is, we know that motorists do not comply with

16   signage.  You present signs and you present warning devices to the

17   motoring public every day, but yet every day in this country there

18   is a train/vehicle or pedestrian/vehicle train collision every two

19   hours.  When a train strikes a vehicle, the chance of loss of life is

20   about 50 per cent greater that you'll die on a train/vehicle collision

21   versus a personal  vehicle to vehicle collision.

22   Q.   So it's your testimony then that if a vehicle using this

23   crossing at Sweetwater Valley Farms were to obey the traffic laws

24   and were to stop at the tracks as they are asked to do, it is a

25   perfectly safe crossing?

1    A.    Yes, sir, it is.

2    Q.    Your concern is, however, that motorists unfamiliar with this

3    crossing will ignore those signs?

4    A.    Yes, sir.

5    Q.    You heard testimony from Mr. Harrison concerning his plans

6    for increasing the amount of traffic coming through there?

7    A.    Yes, sir, I did.

8    Q.    Does that pose an additional concern based upon the increase

9    in traffic alone?

10   A.    Very much, sir.

11   Q.    Please explain why that is.

12   A.    As we talked earlier, you have an original crossing designed

13   as a farm crossing that has now gone into commercial use crossing.

14   You are going to increase the opportunities for a vehicle/train

15   collision.  The more traffic you put over a crossing, the more

16   opportunities you have for that vehicle/train collision.  Increasing

17   the traffic is proportionally increasing the chance of a train/vehicle

18   collision.

19          I am more concerned with vehicles, personal vehicles, versus

20   school buses.  School buses are under– obligated under law to stop

21   and open the doors.  I feel more comfortable with those because

22   they are professional drivers.  People who are not professional

23   drivers have a tendency to focus on other things other than the

24   grade crossing.

25          In this particular case, this crossing directs people to look up

1    the hill.  They may not even see the signs that are there for them.

2    Q.    Are you familiar with the costs involved in maintenance of a

3    crossing of the size at Sweetwater Valley Farms?

4    A.    Yes, sir.

5    Q.    What would you estimate those maintenance costs to be?

6    A.    Over the course of a three- to five-year period, which is what

7    we do track rates on, anywhere within the range of three to $4,000,

8    is what we calculate these days.

9    Q.    And do you have any knowledge whatsoever that anyone other

10   than the railroad has continued to maintain this crossing

11   throughout the years?

12   A.    No, sir, I do not.

13   Q.    Does this crossing or any other crossing like it provide any

14   benefit whatsoever to the railroad?

15   A.    No, sir.  I mean, as I said earlier, we are under an obligation to

16   work with the Federal Railway Administration and the Federal

17   Highway Administration to close 25 per cent of the crossings in

18   this country.  Norfolk Southern actively pursues that goal of

19   closing crossings.

20           The reason we close them is because of the opportunity for a

21   train/vehicle collision and the risks that are associated with that.

22   Private crossings of this nature do not serve any benefit.  They are

23   there for the traffic, vehicle traffic.  As I said, you know, I'd just

24   soon have it removed.

25           MR. MORRIS:   Your Honor, to the extent that I forgot

1   to get my printed out copies of the DOT records that he has and the

2   fact that he highlighted the information that he provided, would it

3   be okay to make his DOT copies the next exhibit?

4                    THE COURT:   Does Mr. Crossley have a copy of those?

5                    MR. MORRIS:    He has– the one he submitted– I don't

6   know if you have the older ones, though.

7                    MR. CROSSLEY:    Your Honor, I have copies of them,

8   but they're not on any exhibit list that was filed.  In fact, the

9   Defendants didn't file an exhibit list.

10                   THE COURT:   The Plaintiffs didn't?

11                   MR. CROSSLEY:   Excuse me.  Plaintiffs did not file an

12  exhibit list.

13                   THE COURT:   All right.

14                   MR. CROSSLEY:    So I'm objecting to making

15  anything an exhibit.

16                   THE COURT:   All right.  And you said–

17                   MR. MORRIS:    I recognize that we did not file an

18  exhibit list.  To that extent, that would be okay.  I'd still prefer, for

19  clarity's sake, to have them in because he's read off them.  But if

20  the Court so rules, I understand.

21                   THE COURT:   All right.  The objection will be

22  sustained.

23                   MR. MORRIS:   No further questions.

24                   THE COURT:   All right.  Mr. Crossley, any cross-

25  examination for this witness?

1      MR. CROSSLEY:   Yes, your Honor.

2                    CROSS-EXAMINATION

3    by Mr. Crossley:

4    Q.    Good morning, sir.

5    A.    Good morning.

6    Q.    We met just a few minutes ago?

7    A.    Yes, sir.  We did.

8    Q.    You visited the crossing yesterday; is that correct?

9    A.    Yes, sir, I did.

10   Q.    Is that the extent of your personal familiarity with this

11   crossing?

12   A.    No, sir, it's not.

13   Q.    Okay.  How many previous times have you visited it?

14   A.    I have not visited this crossing in person.  Over the course of

15   being prepared for this case and being involved in normal duties,

16   this crossing has come up as a project for us in the grade crossing

17   group.

18          I've looked at the photographs of the crossing, I've looked at

19   the track charts, which is a lined diagram of the crossing.  We have

20   track video that is shown on the back of our rail equipment cars

21   that we do for inspection.  So I have looked at the track video on

22   this crossing, so I have seen it on a number of occasions.

23   Q.    Okay.  And I think you testified just a moment ago, when Mr.

24   Morris was asking you whether or not the Sweetwater Valley Farm

25   crossing was a wagon way, you said it was not a wagon way any

1  longer.  I take it your opinion was, at some point in time it was a

2  wagon way?

3  A.    Yes, sir, I believe so.

4  Q.    And what do you base that on?

5  A.    My experience of traveling across our system, being involved

6  in grade crossing safety and being a part of the railroad for 34

7  years.  Look at this type of crossing, look at the nature of the

8  business there and go back and look at why the railroads were

9  designed.

10         I could very easily see the railroad surveyor coming through

11  in the early 1800s across this land here with his surveying

12  equipment and making the line for the railroad and negotiating a

13  deal with the farmer that owned that property at that time.

14  Q.    Okay.  And in 1835, I think you said, wagons were the way

15  that farmers carried their products off their farms for sale?

16  A.    Most of the time, yes, sir.

17  Q.    And prior to the railroad coming around, the wagons were the

18  only way anybody moved anything of grade size; were they not?

19  A.    That, and barges and water, yes, sir.

20  Q.    So wagons were used to move freight as well as farm

21  products; were they not, sir?

22  A.    Yes, it was, at one time, yes, sir.

23  Q.    Now, public crossing, that's not defined by any Tennessee

24  statute that you're aware of, is it?

25  A.    I am not familiar with the Tennessee statutes, so I don't know

1    for sure, sir.

2    Q.    There's not any national standard that defines what a public

3    crossing is, is there?

4    A.    The Federal Railway Administration classifies crossings as

5    either public or private.  They define private crossings or public

6    crossings, those crossings that are maintained on either side of the

7    railroad tracks by a public authority.  That's in a recent rule from

8    the Federal Railway Administration on locomotive horn use.

9    Q.    Okay.  Are you familiar with a publication known as the

10   Private Highway-Rail Grade Crossing Safety Research and

11   Inquiry?

12   A.    Yes, sir, I am.

13   Q.    And that was published, I believe, in May of 2008?

14   A.    Yes, sir, it was.

15   Q.    And was that published by the Federal Railway

16   Administration?

17   A.    Yes, it was.

18   Q.    Pursuant to its authority?

19   A.    Yes, sir.

20   Q.    Granted to it by statute?

21   A.    Yes, sir.

22   Q.    And in this particular– well, I think what this says is

23   consistent with what you say, is that a public crossing is one that

24   on either– either one or both sides of the crossing there is a public

25   road maintained by a public body?

1    A.    Yes, sir, I believe that's correct.

2    Q.    And this particular crossing, Sweetwater Valley Farm, does

3    not meet that definition; does it not?

4    A.    That's correct.

5    Q.    So by default it becomes a private crossing?

6    A.    Yes, sir.

7    Q.    Now, whether or not something is a public crossing or a

8    private crossing has nothing to do with the volume of traffic that

9    goes across it, correct?

10   A.    Not necessarily.  There are many private crossings that are

11   converted to public crossings based on volume of traffic and public

12   use.  The report you're referring to is an effort by the Federal

13   Railway Administration to basically delve into the issue of whether

14   or not the federal government has a right to regulate private

15   crossings, that transaction between the railroad and the private

16   landowners who traverse our railroad.

17          The definition of a public crossing and a private crossing, it

18   varies from crossing to crossing.  It may be a local road authority

19   has established jurisdiction of the road and changed it from a

20   private to a public nature.  So every crossing is really different.

21   Q.    Well, the generally accepted definition of a public crossing is

22   it has a public road on one side or the other, correct?

23   A.    That's correct.

24   Q.    And that has nothing to do with how many vehicles travel on

25   that public road, does it?

1  A.  Again, I believe when the highway authority–

2  Q.  Can you answer that yes or no?

3  A.  No.

4  Q.  You cannot give a yes or no answer as to whether traffic

5  volume–

6  A.  I'm not sure at that point, sir.

7  Q.  Whether a crossing is a public crossing or not has nothing to

8  do with the nature of the traffic crossing it, does it, sir?

9  A.  Again, you're asking for a yes or no answer, and every

10  crossing is different, you know, when they're classified.  The

11  Roadway Authority are the folks that are in charge of the highway

12  traffic.  They are the ones that determine whether or not it's a

13  public or a private crossing.

14  Q.  I understand. But once they have determined that, once it is

15  determined that there is not a public road on either side, then it's a

16  private crossing, correct?

17  A.  I can't say for sure, because I've got crossings out there that

18  only have small industries or a private entity on one side that is

19  classified as a public crossing, when you would normally look at it

20  you would think it was a private crossing. There is not a public

21  roadway on the other side, but it serves the public.

22  Q.  But it has a public roadway on one side?

23  A.  It does, sir.

24  Q.  That's my point.  And it doesn't matter, as long as you have a

25  public road on one side, it doesn't matter how many cars or

1   vehicles go across it, it's a public crossing?

2   A.    I would say most of the time, yes, sir.

3   Q.    And as long as you have a public road on one side, it doesn't

4   matter whether it's tricycles or tractor-trailers, it's a public

5   crossing?

6   A.    Again, most likely, but not in all cases.

7   Q.    And whether it's a public crossing or private crossing has

8   nothing to do with how much money a person on one side of the

9   crossing makes off his land, does it, sir?

10  A.    Money doesn't come into issue with a grade crossing, sir.

11  Q.    And there are businesses besides Mr. Harrison's that use

12  private crossings; is that not correct?

13  A.    That is correct.

14  Q.    Now, your concern, as I understand it, about– is not a public

15  safety concern, it's a user safety concern?

16  A.    Yes, sir, it is.

17  Q.    And the concern is for the motorists that are unfamiliar with

18  this particular grade crossing?

19  A.    Primarily those unfamiliar and any other motorists who may

20  be traversing the crossing.

21  Q.    Well, would it be fair to say that your concern is for motorists

22  that don't pay attention?

23  A.    That's a good portion of it, yes, sir.

24  Q.    Now, that's Exhibit Three. If that's what a motorist sees

25  when he pulls up, he or she pulls up to the crossing, to ignore that

1    they would have to just be cavalier, wouldn't they?

2    A.    Yes, sir.

3    Q.    It's pretty obvious?

4    A.    Yes, sir, it is.

5    Q.    And you're more concerned with the visitors to Sweetwater

6    Valley Farm's cheese operation than you are with other users of

7    that crossing; is that correct?

8    A.    Well, I'm concerned about all users of the crossing, but I

9    think, as we've talked earlier, you know, the people that work there

10   every day, the people that live there every day, are more aware of

11   the trains.

12        People who come to this crossing on a non-regular basis or

13   maybe the first time have more of a concern to us, yes, sir.

14   Q.    Okay.  Are you aware that the federal government, the Federal

15   Railway Administration, has said in that Private Highway-Railway

16   Crossing Safety Research and Inquiry document that drivers who

17   are not as familiar with a particular grade crossing may be more

18   alert to the possibility of the train's approach as opposed to those

19   who are intimately familiar with it?

20   A.    I'm not sure that I've read that in that report, but if you say

21   so.

22   Q.    Do you agree or disagree with that?

23   A.    I think it depends– that's a very general statement, and I think

24   it depends on the driver and also think it depends on the crossing

25   itself, the nature of the crossing the geometry of the crossing, how

1   it's configured.

2   Q.    Aren't you aware in your position that it's human nature,

3   when you go over a crossing day after day after day, that you tend

4   to pay less attention to the possibility of a train as opposed to that

5   person who encounters that grade crossing marked the way it was

6   shown in Exhibit Three for the very first time?

7   A.    I think it's typical of anything we do in our lives, become

8   complacent in the way we do our driving.

9   Q.    So it's really the people that use it on a more frequent basis

10  that are more likely not to keep the proper lookout than those first-

11  time visitors; is that correct?

12  A.    Part of it is correct.  But, as Mr. Harrison has already said, he

13  is very concerned about the safety, he talks to his new employees,

14  he talks to his family about that crossing.  So they are very much in

15  tune to it.

16  Q.    As a matter of fact, I think that he says that that '93 accident

17  was one of his employees?

18  A.    I believe so, yes, sir.

19  Q.    And the accident that happened in '06, after he opened up the

20  cheese plant, was somebody coming to visit one of his employees?

21  A.    I believe so.

22  Q.    Now, your company recently raised the speed of its trains

23  through the area where Mr. Harrison's farm lies; did it not?

24  A.    I do not know that to be a fact, sir.  Not my area of

25  responsibility.

1    Q.    Whose area of responsibility is it?

2    A.    Division management.

3    Q.    Is that something Mr. Driskell will know about?

4    A.    I believe Mr. Driskell can testify to that.

5    Q.    Well, would you agree or disagree that it's safer– that a train

6    becomes safer the faster it goes?

7    A.    Generally, the statistics and the reports will show you that

8    consistent train speed over a section of track provides a better level

9    of safety. The motorists who see trains going at varying speeds–

10   it's only speeds through the cities and communities– have a

11   tendency to try and beat the train.

12          A train also clears a crossing at a much faster time, at a higher

13   speed. That's why they try to do consistent speeds across the

14   crossings.

15   Q.    So going faster is a good thing?

16   A.    In most cases, yes, sir.

17   Q.    So if you are concerned about a particular crossing, it would

18   be less safe to slow down at that crossing than to maintain a

19   constant speed?

20   A.    Speed of the train really doesn't affect the crossing itself; it

21   affects the operation of the train. You don't have the train

22   stopping and starting, slowing down. That's where it comes into

23   the operation of the train.

24   Q.    The accident that you talked about that happened on May 27,

25   2006, that involved a vehicle that was stopped on the tracks; did it

1  not?

2  A.    Yes, sir.  That's what the report says.

3  Q.    Okay.  Not one that was crossing the tracks as the train

4  approached?

5  A.    Typical of what we find when we see this kind of box checked

6  on it is that the motor vehicle operator approached the crossing and

7  stopped right there at the point when they saw the train, stopped on

8  the crossing.  That's usually what that block means when it's

9  checked.

10  Q.    But it also can mean a vehicle just stuck in the middle?

11  A.    There is a category for vehicles that are stalled on the

12  crossing, vehicles that are trapped on the crossing.  There are four

13  different classifications.

14  Q.    Or moving over a crossing?

15  A.    Moving over the crossing is one of the categories.

16  Q.    So if it was moving across the crossing and stopped, what are

17  the instructions on which box to check?

18  A.    It is based upon the officer's investigation, statements from

19  the driver.  Typically, if the motor vehicle pulls up to a crossing

20  and stops before the train got there, they classify it as stopped at a

21  crossing. If the vehicle was moving across the crossing and the

22  crew reported no vehicle stoppage, they will classify the vehicle as

23  moving across the crossing.

24  Q.    And your testimony is it's the Federal Railway

25  Administration that fills these out?

1    A.    No, sir.

2    Q.    Who fills these out?

3    A.    These reports are filed and prepared by Norfolk Southern

4    under the federal law. We submit these reports to the Federal

5    Railway Administration, which is a part of the Department of

6    Transportation.  We are required to report these to the FRA.

7              THE WITNESS:    Your Honor, may I have a glass of

8    water?

9              THE COURT:   We'll give you a whole bottle.

10             THE WITNESS:    Thank you very much.

11             MR. CROSSLEY:    Nothing further of this witness at

12   this time, your Honor.

13             THE COURT:   All right.  Any further questions from

14   the Plaintiff for this witness?

15                         REDIRECT EXAMINATION

16   by Mr. Morris:

17   Q.    Mr. Barringer, you heard a line of questioning concerning the

18   types of situations in which a vehicle might come to the crossing,

19   correct?

20   A.    Yes, sir.  Yes, sir.

21   Q.    Is your primary concern, going forward and as it is today,

22   solely the amount of vehicle traffic that comes and uses that

23   crossing on a daily basis?

24   A.    Yes, sir.  The change and use on that crossing, yes, sir.

25             MR. MORRIS:    Thank you. No more.

1            RECROSS-EXAMINATION

2    by Mr. Crossley:

3    Q.    So if I hear you correctly, if Mr. Harrison's dairy farm

4    accounted for 300 vehicles in and out each day, you would have the

5    same concern as you do because of his cheese operation?

6    A.    I'd still have concern about any vehicles going to cross, but I

7    would have a little bit less because they are the people using the

8    crossing every day. So I still have concern for them, I care about

9    them, but I more worry about the people who come to this crossing

10   on a non-regular basis.

11              MR. CROSSLEY:    Nothing further.

12              THE COURT:    Okay. I'm not going to ask this. I'll

13   leave it up to the lawyers. Thank you for your testimony, sir. You

14   may step down.

15              THE WITNESS:    Yes, sir. Thank you.

16        (Witness excused.)

17              THE COURT:    Next witness, please?

18              MR. MORRIS:    We'll call Steve Driskell. And, your

19   Honor, can I get water, too?

20              THE COURT:    We can get you some.

21        (Discussion between Court/courtroom deputy off the record.)

22              THE COURT:    And we'll restock (ck).

23        (Recess had at 10:33 a.m.; Court reconvened at 10:40 a.m.)

24              THE COURT:    Next witness, please.

25              COURTROOM DEPUTY:    Please raise your right

1   hand.  Do you solemnly swear or affirm the testimony you will give

2   in the matter in the court today will be the truth, the whole truth,

3   and nothing but the truth; if so, please say, "I do."

4                    MR. DRISKELL:  I do.

5                    DIRECT EXAMINATION

6   by Mr. Morris:

7   Q.    Would you state your name for the record, please?

8   A.    Steve Driskell.

9   Q.    And who is your employer?

10  A.    Norfolk Southern Railway.

11  Q.    And what is your title at Norfolk Southern?

12  A.    I am a division road foreman of engines.

13  Q.    How long have you had that title?

14  A.    Since 1987.

15  Q.    And what is the area of land that you supervise under that

16  title?

17  A.    I have the territory that's known as the A-line between

18  Bristol, Virginia, and Chattanooga, Tennessee, which encompasses

19  between Knoxville and Chattanooga, the area we have been talking

20  about this morning.  Also cover the area from Chattanooga to

21  Cincinnati, Ohio, and also lines coming in from Louisville,

22  Kentucky, and the Danville, Kentucky, in that area.  And there's

23  also some lines come from the– into the Bristol/Chattanooga line

24  from Ashville, North Carolina, and over to Virginia, about 1,200

25  miles of railroad.

1    Q.    What are your duties as your job title?

2    A.    My main responsibility is training and supervision of

3    engineers, talking about the locomotive engineers, and they do

4    have jurisdiction over the other crew members on the trains in

5    dealing with the operations, daily operations.

6    Q.    So I take it you are familiar with the crossings that we're

7    talking about today?

8    A.    Yes.

9    Q.    You have been to that crossing?

10   A.    Yes.

11   Q.    How many times are you at that crossing?

12   A.    With as much territory I have, I try to make it over to each

13   subpart of the division onced a quarter, and I have been doing this

14   since, like I said, 1986, when I first came here.

15   Q.    So not to put words in your mouth, plenty of times?

16   A.    Four times a year at a minimum.

17              THE COURT:   Sir, did you say 40 or four?

18              THE WITNESS:    Four. I'm sorry.

19              THE COURT:   Thanks.

20   Q.    Are you familiar with the operations of most or all of the

21   trains in your area?

22   A.    Yes.

23   Q.    How many trains operate in the stretch of track by Sweetwater

24   Valley Farms per day?

25   A.    You're speaking of now?

1    Q.    Yeah.

2    A.    We'll average anywhere between 15 to 20 trips per day.  Also

3    have a lot of coal operation through there, and that could change,

4    but a minimum of 15 and could be 20 to 25.

5    Q.    Did you say coal operation?

6    A.    Yes.

7    Q.    And where does that coal come from?

8    A.    From the Virginia coal mines.

9    Q.    What speeds do they average in a stretch of track that the

10   crossing is at?

11   A.    The track itself is actually Class Four classification track,

12   which is a 60-mile per hour maximum speed that's allowed, and in

13   the area will average anywhere from 30 to 45 miles per hour

14   average train speed.

15   Q.    Would you have general knowledge of advisements given to

16   crew of trains traveling in the area you're responsible for?

17   A.    Yes.

18   Q.    Do you issue or supervise the issuance of those advisements?

19   A.    I'll oversee that sometime, but not issuing, no.

20   Q.    Do you have any specific recollection of any advisements

21   being issued at Sweetwater Valley Farm crossing?

22   A.    I do recall in the past several years that there's been an

23   advisement placed out due to the cheese factory festival or the

24   cheese festival, as it's known.  We didn't do anything except just

25   actually put on some of the instructions that our crews received

1  prior to going on duty that the festival was ongoing, the times that

2  we note that they're there and that we asked them to be more

3  vigilant in those areas.

4  Q.    Are you familiar with schedules of the Norfolk Southern

5  trains that run in your area?

6  A.    Yes.

7  Q.    Are you then familiar with any delays that occur with those

8  trains?

9  A.    I would be, yes.

10  Q.    We've heard testimony about the accident that occurred in

11  2006. Are you familiar generally with that accident?

12  A.    I know of it. I didn't respond to it, but I know of it, yes.

13  Q.    So you were not there on the scene?

14  A.    No, sir.

15  Q.    Do you know specifically how long the train was delayed at

16  that accident?

17  A.    Not without reviewing the records I wouldn't know

18  specifically.

19  Q.    Assuming from– that what we've heard from Mr. Barringer

20  and Mr. Harrison about the extent of the accident, how long did

21  you expect that delay to last?

22  A.    Anytime that we have brakes on emergency on a train, you're

23  looking at a minimum two to three hours, just about any time.

24  Q.    And would that include also instances where the brakes are

25  thrown and there's not an actual collision?

1   A.    Yes.

2   Q.    And what again causes the two- to three-hour delay when the

3   brakes are thrown?

4   A.    Well, I think Mr. Barringer's testified too, is once it happens

5   we have to actually visually inspect each wheel on each car to make

6   sure we have nothing derailed because of the forces that occur

7   when the brake's applied in an emergency.  And to do that they

8   actually have to walk from the head portion to the rear portion and

9   then back up the other side.  Have to check both sides of it.

10  Q.    Would a delay such as the one in the accident of 2006 or in the

11  near miss of 2007, would that delay affect only that train?

12  A.    No. It affects everything working that would be working not

13  only on that corridor, but possibly some of the other corridors also.

14  Q.    So is it fair to say that a three-hour delay on a train that has

15  had to stop will affect other trains down the line?

16  A.    Yes.

17  Q.    How far will it take for your schedules to get back on track,

18  assuming a three-hour delay?

19  A.    How far?

20  Q.    Yeah, how far do you know– I mean, how many– how long

21  will it take?

22  A.    Oh, it's– you're talking about time, time frame?

23  Q.    Right.

24  A.    Minimum, 12 hours, and possibly a day, up to 24 hours,

25  according to how much delay and the amount of traffic on the

1    corridor itself.

2    Q.    And you testified that 15 to 20 trains come through that

3    specific track a day?

4    A.    Presently, yes.

5    Q.    If a train is delayed for three hours, is it possible that all 15 to

6    20 trains are also delayed for a day?

7    A.    Possibly, yes.

8    Q.    Are the delays more lengthy if there's more significant

9    injuries, as in the one, the accident that we have heard testimony

10   about in the 80s?

11   A.    Definitely. Anytime that you've got a fatality, there will be

12   more delay.

13   Q.    How long are those delays?

14   A.    Usually it will run anywhere from the five- to seven-hour

15   range.

16   Q.    And why is there an increase in time?

17   A.    More investigation. The local authorities have to actually

18   respond usually with– especially in the case of a fatality, a coroner

19   has to do their investigative part, too. There is a lot more details

20   about it than say just the regular bumper collision that would

21   occur.

22   Q.    Are you familiar with maintenance associated with crossings

23   in your area?

24   A.    While that's not part of my jurisdiction, I do know from

25   working closely with the engineering department on what they do

1   as far as the maintenance, yes.

2   Q.    What goes into maintenance on a crossing like the one at

3   Sweetwater Valley Farm?

4   A.    We, especially on an area of track that's like this area,

5   between Knoxville and Chattanooga– it's known as a high-density

6   line, which means we have a lot, lot of traffic on the area.  We'll

7   usually come in and do what's known as tie and servicing, which is

8   putting new cross-ties in and leveling or servicing the ballast area,

9   and that's done on a three-year basis.  Every three years that

10  occurs.

11         When that happens, the crossings that are passing the railroad

12  have to be torn out and the tie and servicing work done underneath

13  those crossings.

14  Q.    To your knowledge, has anyone other than Norfolk Southern

15  ever performed maintenance on the crossings at Sweetwater Valley

16  Farm?

17  A.    No.

18  Q.    To your knowledge, has Mr. Harrison ever paid any money to

19  Norfolk Southern for the maintenance of that crossing?

20  A.    No.

21  Q.    Are there any plans in the future to expand the track or

22  increase the traffic through that stretch of track?

23  A.    We have what's known as a heartland corridor project that's

24  ongoing right now.  Basically, what it is, is some of the trucking

25  industries from the northeast harbors and ports, we actually handle

1    and transport their traffic to some of the southern ports, like in

2    New Orleans and some going to Texas. That's ongoing.

3         And there's an increase has been projected starting in the first

4    of the spring next year, which should increase our train counts

5    from the 15 to 20 to anywhere from 18, 20, to 25 per day.

6    Q.    So by the summer of next year you might be running 20, 25

7    trains per day through there?

8    A.    From projections and everything I've heard, we will be

9    running that many, and plus you've got the coal business that is

10   increasing as we– even though we're in bad times economically,

11   our coal is still good right now.

12   Q.    What other materials are run through this stretch of track

13   besides coal?

14   A.    Well, we have our mixed freight that operates. It is our– it's a

15   hazardous material route. Due to the fact that Tennessee Eastman

16   traffic that we haul from Kingsport to Tennessee Eastman plant in

17   Kingsport going out to Longview, Texas, there are two of those

18   trains daily that run over this line.

19        And the potential, as I stated, for the– which I think inevitable

20   is going to happen, the northeast corridor traffic, which will be our

21   UPS and Schneider and J. B. Hunt traffic, will be running through

22   there.

23              MR. MORRIS:   Thank you. No more questions.

24              THE COURT:   Any cross-examination for this witness?

25              MR. CROSSLEY:   Yes, the Court please.

CROSS-EXAMINATION

by Mr. Crossley:

Q.    Now, Mr. Driskell, do I understand your testimony, that the only delays that have occurred as a result of the private crossing at Sweetwater Valley Farms occurred when there were accidents there?

A.    The only delays that occurred at this crossing?

Q.    As a result of the crossing.

A.    No. There have been near miss reports there also.

Q.    Okay.  And the near miss would cause delay because the engineer actually had to throw the brakes and bring the train to a stop?

A.    Yes, sir.

Q.    Okay.  Are you aware of more than one near miss?

A.    The only one I'm aware of is one that happened last year.

Q.    That has been discussed here today?

A.    Yes.

Q.    Okay.  So other than that one near miss and the three accident reports that have been talked about, those are the only instances of delay that you're aware of resulting from the use of the Sweetwater Valley private crossing?

A.    Yes.

Q.    And those types of delays are going to occur at public or private crossings anytime that there are either accidents or near accidents, correct?

1    A.    Yes.

2    Q.    And you heard Mr. Barringer testify as to the frequency of

3    accidents that occur involving trains and vehicles and/or

4    pedestrians; is that correct?

5    A.    Yes.

6    Q.    So there are delays occurring all over the nation, every day, as

7    a result of accidents or near misses?

8    A.    That's correct.

9    Q.    And you're not about to tell this court that Sweetwater Valley

10   Farms has caused more delays than anyone else?

11   A.    No.

12   Q.    And those delays occur because, anytime a train is stopped,

13   that impacts upon the company's ability to move the freight in a

14   timely manner?

15   A.    It's the– I don't know the proper wording for this, but it's the

16   unknown delays that affect our–

17   Q.    That's right.

18   A.    Yes.

19   Q.    That's right. So if a train has to stop for whatever reason,

20   that's going to affect your timetable?

21   A.    The unknown, yes.

22   Q.    And I think you said it would be a two- or three-hour delay for

23   the '06 accident, you would expect a two- or three-hour delay to

24   occur?

25   A.    At a minimum, yes.

1    Q.    Okay. Now, your engineers, they're paid by the hour?

2    A.    No. They're paid on mileage basis.

3    Q.    Okay. So no matter how long it takes them to get from

4    Knoxville to Chattanooga, they're paid the same thing?

5    A.    Unless they get into the overtime rate, which is based on their

6    mileage. While I say they're paid by mileage, you can break it

7    down to an hourly rate, but they are paid per mileage. Then if they

8    get into their overtime, gets kind of confusing.

9          But after they have gone so many miles and they've worked so

10   many hours, then they start getting paid overtime. It gets a little

11   confusing, but it's based on the mileage.

12   Q.    So there are times when they are on an hourly rate of sorts?

13   A.    Yes, of sorts.

14   Q.    And I think, would you agree, that going from 15 to 20 trains

15   a day to 20 to 25 trains that's forecast coming up this spring is a

16   change in the nature of the usage of the tracks in that area by

17   Norfolk Southern?

18   A.    The amount of traffic, yes.

19   Q.    Yes.

20             MR. CROSSLEY:    Bear with me just a moment, your

21   Honor. Nothing further of this witness, your Honor.

22             THE COURT:   Counsel?

23             MR. MORRIS:    Nothing further, and this will be our

24   last witness.

25             THE COURT:   All right. Thank you for your testimony,

1    sir.

2              THE WITNESS:    Thank you.

3              THE COURT:   You may step down.

4         (Witness excused.)

5              THE COURT:   Defendants' witnesses?

6              MR. CROSSLEY:    I'd like to recall John Harrison.

7              THE COURT:    All right. Mr. Harrison. Mr. Harrison,

8    you're still under oath.  Mr. Crossley, anytime you're ready.

9                        DIRECT EXAMINATION

10   by Mr. Crossley:

11   Q.    Mr. Harrison, I believe you said earlier you were not at the

12   farm when the '06 accident occurred; is that what I remember

13   correctly?

14   A.    That's correct, yes.

15   Q.    Did you subsequently go back down there?

16   A.    Yes.

17   Q.    Did you observe the engineer walking the train as it was

18   described to see if all wheels were still on the track?

19   A.    Yes.

20   Q.    Did you assist the engineers?

21   A.    No, sir.  It was a different time.

22   Q.    Was that a different one?

23   A.    It was a different time.

24   Q.    Was that when the near miss occurred?

25   A.    Yes.

1  Q.    Okay. And did you assist the engineer then in walking–

2  A.    No.

3  Q.    –or observing the length of the train?

4  A.    I don't know if it was the engineer or the conductor who

5  walks the– I don't know which one has to walk the track, who is it.

6  Q.    Did you assist a Norfolk Southern person?

7  A.    Yes.

8  Q.    How did you assist him?

9  A.    When he got to the end of the train, we brought him back to

10  the engine.

11  Q.    Did he make a comment about not caring how long it took for

12  him to get back?

13  A.    He did.

14  Q.    What was that comment?

15  A.    He was on overtime, he wasn't in any hurry, basically, so–

16  Q.    Okay. Now, the railroad has put on testimony about how

17  delays impact them and their ability to move their trains on a

18  timely basis. Have you seen any instances where your cheese

19  operation would have caused any delay in the operation of the

20  railroad?

21  A.    Besides those things that were mentioned, a couple other

22  instances that we've kind of found humorous, is that the number of

23  times the train's been sitting there, and when I checked to see

24  what's going on, they've actually stopped the train to come up and

25  buy cheese.

1   Q.    Okay.  You personally have seen that?

2   A.    Yes.

3             MR. CROSSLEY:   Nothing further.

4             THE COURT:  Cross-examination, please.

5             MR. MORRIS:   None, your Honor.

6             THE COURT:   All right.  Thank you for your testimony,

7   sir.  You may step down.

8        (Witness excused.)

9             MR. CROSSLEY:   The Defendant rests, your Honor.

10            THE COURT:   All right.  Any rebuttal testimony from

11  the Plaintiff? No? All right.  Oh, just a minute?  Okay.

12            MR. MORRIS:   Your Honor, I'd call Bill Barringer

13  very briefly.

14            THE COURT:   All right.  Mr. Barringer, you're still

15  under oath.  Counsel, you may–

16            THE WITNESS:   Yes, sir.

17            THE COURT:   Counsel, you may start when you're

18  ready.

19                    DIRECT EXAMINATION

20  by Mr. Morris:

21  Q.    Mr. Barringer, you just heard testimony concerning an

22  incident about overtime pay and our cost projections concerning

23  overtime pay and how that works.  The estimates of costs that you

24  gave to us, is that solely based upon labor costs?

25  A.    No, sir.  The factors that go into train delay are locomotive

1    costs, what it costs for that locomotive to be operating, not pulling

2    traffic, car hire. Most of the cars that you see in service today are

3    rented out, they are owned by somebody else or rented out to other

4    people. So there is a per diem cost, and that breaks down into an

5    hourly cost.

6           And then, of course, there is the crew cost, what the crew

7    normally makes in their wages. So there's three components that

8    go into a per hour delay.

9                 MR. MORRIS:   Nothing further, your Honor.

10                THE COURT:   Mr. Crossley?

11                MR. CROSSLEY:   Nothing further, your Honor.

12                THE COURT:   Thank you for your testimony, sir.

13                THE WITNESS:   Yes, sir.

14                THE COURT:   You may step down.

15         (Witness excused.)

16                MR. MORRIS:   We have nothing further, your Honor.

17                THE COURT:   All right. The evidence will be closed,

18   both sides. All right. Thank you, counsel. Gentlemen, I don't

19   recall, did we discuss waiving or not any closing statements or how

20   did you all decide to proceed after the closing of the evidence.

21   Counsel?

22                MR. MORRIS:   I don't think we addressed one, but I

23   have one prepared. It's not an epic, so–

24                THE COURT:   All right. Well, we'll certainly hear

25   what counsel has to say. I just wanted to see if you all had reached

any agreement among yourselves. Sometimes in nonjury matters
the parties decide to wait or do something else. But we'll hear
from the Plaintiff then. Counsel?

MR. MORRIS:    Thank you, your Honor. Today you've
heard testimony of the burden that the railroad sustains that they
use– that they have while using the tracks at this crossing. You've
heard specific testimony about the costs associated with those
delays, you've heard about the hours lost, the hours we've already
sustained and the hours that we might sustain in the future.

You've heard testimony about how those hours project further
than that one incident alone and can affect trains down the line.
You've heard specific dollar figures concerning that. You've also
heard of evidence about drastic change in the use of this crossing
since Mr. Harrison both began his farming operation with dairy and
began his cheese manufacture operation.

What presumably began as a small farm crossing has been
changed to a quasi public crossing that is used 300 times a day and
that also entails plans to increase it in the future. Your Honor, this
is no longer a wagon way as that implies and is no longer a
convenient crossing in any sense of the word because it's not
maintained for the owner of the fee solely. Case law suggests that
the railroads can close a crossing in the interest of public safety.

Mr. Barringer testified about the increase in traffic alone
could lead to the increase in the likelihood of an accident. Case
law suggests that an easement cannot be burdened by the serving of

1  an estate or the nature of that easement use changed; and the facts,

2  as demonstrated, that both the nature of the use of the crossing and

3  the traffic counts there have dramatically increased.

4  We have demonstrated that we have been burdened by the

5  Harrison's use of the crossing and have lost significant amounts of

6  money through this. This is especially true considering that the

7  railroad has continued to maintain this crossing without an

8  agreement in place and without any requirement to do so.

9  Case law also suggests that a fee holder cannot interfere with

10  the railroad's use of their tracks for any reason. The railroad has

11  an absolute right to operate its tracks under the rules promulgated

12  by the FRA. For the reasons stated already, we believe that we are

13  having unreasonable interference with their use here.

14  So the three theories that we presented, right to close the

15  crossing for public concern, the burden in our easement, and

16  interference to our operations, we believe, all carries our case. The

17  proof has demonstrated that the claim of the wagon way or

18  convenient crossing wouldn't apply to this case because the

19  crossing has eclipsed any reasonable interpretation to those

20  phrases.

21  Mr. Harrison's use of the crossing as it is presently is

22  significantly different from what was contemplated at the outset of

23  whatever agreement the railroad came with. But you also heard

24  plans about his business growth and dramatic increase in the use of

25  the crossing.

1    You've also heard that his property isn't even land-locked

2    and that if he so chose he could provide a driveway into his land

3    that would not cross these tracks and subject his invitees to danger.

4    And yet he continues to operate his business and use this crossing

5    without any agreement in place and burdening the railroad.

6    This, your Honor, is the core of the case. Mr. Harrison

7    demonstrates a desire to operate his business in contravention of

8    the law and he desires the railroad to ultimately be responsible and

9    to subsidize all the risk associated with his invitation to the public

10    to visit his farm.

11    He also asks the railroad to expose themselves to risks of his

12    growth without any contribution on his part. And these invitations

13    will be extended to church groups, tour groups and now school

14    buses.

15    For these reasons we petition the Court to have leave to close

16    this crossing or restrict its use. We've also asked an equity for you

17    to fashion a remedy for the Harrisons to take responsibility and pay

18    for the installation of safety equipment as so necessary. Thank

19    you, your Honor.

20    THE COURT:  All right. A couple of quick questions,

21    counsel, while you're at the podium.

22    MR. MORRIS:  Yes, sir.

23    THE COURT:  Is the easement itself legal?

24    MR. MORRIS:  Is it legal?

25    THE COURT:  Yes. I'm just trying to get the basics

down here. We will see what everyone agrees on. Is the easement legal?

      MR. MORRIS:   Oh, it's been stipulated by both parties that the railroad has a right-of-way through the land that extends from that 1836 charter with Hiawasee. So, yes, it's legal.

      THE COURT:   Okay. So the Plaintiff stipulates the easement is legal. All right. Is the current use of the easement by the Defendants legal?

      MR. MORRIS:   No, your Honor. We acknowledge that that charter lays out an obligation to provide wagon way. We don't understand and we don't know, because we can't trace the records, whether that would apply now.

      I mean, there's a suggestion that the wagon way would have been completed upon the completion of the tracks in the 1850s. To that extent, it's legal maybe to use it as wagon way or convenient crossing for his purposes.

      But we believe that the dramatic growth of the farming business and certainly the change to tourism and retail sales makes the Harrisons' use of our right-of-way illegal.

      THE COURT:   And when did the use become illegal?

      MR. MORRIS:   It would be difficult to put a time on the dairy farm usage because, as he noted when he moved in, a dairy farm was operating. But he said that there were 200 to 300 cows when he took over; now we have 2,000.

      So I think it would be hard to put a date on, as far as the dairy

1  farming operation, when the burden became so strenuous to us that
2  it became illegal.  Certainly we think that the second that he
3  opened a cheese retail store and started advertising the public to
4  use this crossing that it clearly went against any underlying
5  implied agreement between the parties.
6         THE COURT:   So your position is, when the cheese
7  retail store opened it became illegal?
8         MR. MORRIS:    And to that extent has grown more and
9  more burdensome through the years, yes.
10        THE COURT:   All right.  Thank you, counsel.
11        MR. MORRIS:    Thank you.
12        THE COURT:   Mr. Crossley?  Do you agree the
13  easement is legal, Mr. Crossley?
14        MR. CROSSLEY:   Yes, your Honor.
15        THE COURT:   Okay.  Is the current use of the easement
16  by your clients illegal?
17        MR. CROSSLEY:   No, your Honor.
18        THE COURT:   All right.  Let me hear your argument.
19        MR. CROSSLEY:   Your Honor, as I understand the law
20  of easements in our state, the owner of the serving estate, in this
21  case, Mr. Harrison, owns the fee that underlines the railroad track.
22  The railroad simply has an easement over his fee ownership.  And
23  he may use his property, including the property over which the
24  railroad has an easement, as long the use does not interfere with
25  the purpose of the easement held by the railroad.

1    I submit, your Honor, that simply crossing the track to get

2    from one side to the other is clearly permissible use of the

3    easement area, because not only the charter of the railroad, but a

4    general statute of this state requires the railroad to allow passage

5    from one side of their track to another where their track bisects a

6    person's property.

7    Now, what the railroad is asking this court to declare the law

8    to be is that a landowner whose property is bisected by the tracks

9    may make minimal use of his property and may cross the tracks in a

10   minimal amount. But if the owner is successful in the use of his

11   property, if his farm grows, if his business grows, if he has a lot of

12   friends, that that becomes an unreasonable use of the easement.

13   The only interference evidence that we heard today arose

14   from delays, two or three hours in nature, at times when there were

15   either documented accidents– and there were three of them– or a

16   near miss of which, in the memories of those in the courtroom,

17   back, there were one.

18   And I submit, your Honor, that simply having four instances

19   where the railroad was inconvenienced does not rise to the level of

20   persistent interference with their use of the easement so as to give

21   this court authority to do something.

22   They suggest that this court has authority because of the

23   inconvenience on four occasions spread out over a 35-year period,

24   that this court has the authority to close the easement– the

25   crossing, in essence take away Mr. Harrison's right that the

1    legislature gave him to cross from one side to the other.

2           I submit that's not based upon any case law on point, that's

3    not based upon any statutes on point. They're simply asking the

4    Court to take four incidents and somehow fashion a remedy when, I

5    submit, your Honor, there has not even been a legal wrong.

6           I could go on and on, your Honor. I think the proof is very

7    clear that there has not been any interference based upon the

8    Harrisons' use, and, as such, the case should be dismissed.

9           THE COURT:   All right. Thank you, counsel.

10   Anything else? No? All right. Thank you, counsel. Madam Clerk,

11   the Court is going to be in recess until one o'clock.

12          MR. CROSSLEY:   Your Honor, the pretrial order

13   suggested or it said the Court would determine after the trial

14   whether we needed to file anything in the way of findings of fact or

15   conclusions or are we relieved of that obligation?

16          THE COURT:   Yes. Anything else?

17          MR. MORRIS:   No. Thank you, your Honor.

18          THE COURT:   Well done, counsel. Thank you.

19          (Hearing concluded at 11:15 a.m.)

**C E R T I F I C A T I O N**

         I certify that the foregoing is an accurate transcript of the record of
proceedings in the titled matter.


_/s/Donnetta Kocuba_                    _10/31/08_

Donnetta Kocuba, RPR-RMR
Official Court Reporter
U.S. District Court
Knoxville, Tennessee